BRAY, Appellant, vs. JONES and others, Respondents.

*May 14—June 21, 1926.*

*Corporations: Stockholders depositing stock with trustees: Right of trustee to purchase stock of individual: Duty to make disclosure of material facts: Presumption of fraud.*

1. A trust agreement by which, in order to facilitate the financing of a railroad corporation, the stockholders surrendered to trustees all the property and stock of the railroad and received therefor certificates reciting that the stockholders owned an interest in the stock deposited with the trustees, creates the relation of trustee and *cestui que trust* between the trustees and the stockholders, collectively and individually.  p. 588.

2. A trustee whose duty it is to make a sale of the trust property cannot purchase it of the *cestui que trust;* but the authority

of trustees to sell the stock of all the stockholders did not authorize a sale of the stock of individual stockholders. p. 589.

3. One of several trustees to whom the stockholders surrendered all the property and stock of a corporation with authority to sell is not disqualified to purchase the stock of an individual stockholder; but he is bound to inform the stockholder of every fact and circumstance within his knowledge affecting the value of the stock. p. 589.

4. A contract by which a trustee acquires the interest of a beneficiary is presumed fraudulent, the trustee having the burden of clearly showing that the parties acted at arm's length, or that the transaction was to the advantage of the *cestui que trust*, that he was given full information, and that the trustee acted in the utmost good faith. p. 590.

5. A purchase of the stock by a trustee is fraudulent and voidable where the stockholder was not informed that one railroad was considering a purchase of the line, that another had investigated the property, and that the officers of a third had inspected it. p. 594.

APPEAL from a judgment of the circuit court for Winnebago county: FRED BEGLINGER, Circuit Judge. *Reversed.*

For the appellant there were briefs by *Rix, Barney & Kuelthau,* attorneys, and *J. G. Hardgrove,* of counsel, all of Milwaukee, and oral argument by *Mr. Carl B. Rix* and *Mr. Hardgrove.*

For the respondents there was a brief by *Bouck, Hilton, Kluwin & Dempsey* of Oshkosh, attorneys, and *W. A. Hayes* and *Frank T. Boesel,* both of Milwaukee, of counsel, and oral argument by *Mr. Hayes, Mr. Boesel,* and *Mr. John F. Kluwin.*

OWEN, J. This action was brought by the plaintiff for the rescission and cancellation of the sale of certain shares of the capital stock of the *Wisconsin & Northern Railroad Company.* From a judgment in favor of defendants the plaintiff appeals. The record is voluminous and, in many respects, the evidence is in conflict. The facts, however, which require a reversal of the judgment are comparatively

brief and undisputed. We shall confine ourselves to a statement of only such facts.

The *Wisconsin & Northern Railroad Company,* a Wisconsin corporation, was organized during the year 1905, with an authorized capital stock of $1,500,000, by a group of men largely interested in forest and timber products. It was organized for the purpose of constructing and operating a line of railroad between various points in the state of Wisconsin, extending for the most part through the timber regions of the state, and largely to enable those interested in the road to market their timber products. The original plan contemplated the building of a road from Neenah and Menasha in a northerly direction to North Crandon, with connections at each end with the Minneapolis, St. Paul & Sault Ste. Marie Railroad Company. The road was constructed in a piecemeal fashion, and it was not until the fall of 1920 that the original plan was fully consummated, the last gap between Appleton and Neenah and Menasha having been constructed during the season of 1920.

*William M. Bray* was the holder of 772 shares of the stock of said company of the par value of $100 each. He had owned this stock for a number of years, during a portion of the time had been a director of the corporation, and until about a year before the sale of his stock to the defendant *Jones* had been in rather close touch with the affairs of the corporation.

On the 14th day of February, 1919, a trust agreement was entered into between the stockholders of the corporation and the defendants *John S. Jones* and *C. H. Hartley* and five other individuals as trustees. This agreement provided that all the certificates of the capital stock of said company should be deposited with the Wisconsin Trust Company of Milwaukee as depository, properly indorsed for transfer on the books of the corporation, and that the shares represented thereby should be assigned to the said trustees, pro-

vided "that the trustees may, if they deem it wise, permit not to exceed one share of stock to stand on the books of the *Northern Company* in the name of such person or persons respectively as they may desire to qualify to act as directors, and in such event the certificate or certificates for such qualifying share or shares of stock shall be indorsed in blank by the person or persons in whose name or names they shall have been issued, and shall be forthwith deposited with the depository and held by it in like manner as the shares issued in the names of the trustees." It was provided that after such deposited shares of stock shall have been duly transferred to the said trustees or to persons whom said trustees desire to qualify as directors of the company as aforesaid, the certificate or certificates therefor shall be returned to and thereafter remain in the custody of the depository under the control and disposition of the trustees aforesaid. Upon the depositing of this stock with the depository, the depository was required to issue a certificate to the depositing stockholder to the effect that such depositing stockholder had an interest in the stock deposited with the depository to the extent of the number of shares stated in such certificate. It was provided that "during the period aforesaid the legal title and all rights, powers, and privileges in, to, and over the stock represented by said deposited certificates, including the right to vote thereon, and any and all other rights incident to the ownership thereof, shall be and remain vested in said trustees except as herein otherwise provided." The trust agreement also provided:

"In exercising their rights, powers, and privileges hereunder, the trustees, in voting upon any and all matters which may come before them at any stockholders' meeting, will exercise their best judgment as to what action shall be for the best interests of the *Northern Company.*"

"The trustees shall possess and be entitled to exercise all rights of every name and nature in respect to all stock deposited with the depository hereunder, including the sole

right to vote thereon at all meetings of the stockholders of said *Northern Company.* Subject to the requirement as to two directors being representative of the interests of the bondholders in the management of the business of the *Northern Company,* the trustees may vote for any of themselves as directors and officers of said *Northern Company,* and may in all other respects vote and act as the absolute owners of said stock and as if certificates of beneficial interest in respect thereof had not been issued hereunder."

"The trustees are hereby authorized, by action of at least three fifths thereof, to sell the stock of the *Northern Company* deposited hereunder at such price as in the judgment of said three fifths of said trustees may be adequate; provided, however, that any such sale made by said trustees pursuant to authority hereby granted must cover all of the stock of the *Northern Company* deposited hereunder and not part thereof only. The proceeds from the sale of said stock so sold by the trustees shall be deposited with the depository hereunder, who shall distribute the same among the holders of certificates of beneficial interest issued hereunder in proportion to the interest of each such holder in said deposited stock as evidenced by his certificate of beneficial interest issued hereunder."

Another significant provision of the agreement required the trustees from time to time to "inform the holders of certificates of beneficial interest in the trust regarding the progress and condition of the business of the *Northern Company.*"

The purpose of this trust agreement was evidently to facilitate the financing of the company by giving the bondholders representation on the board of directors. The sum and substance of the trust agreement, however, was to transfer to the seven men named as trustees all of the powers over the corporation which are vested by law in the stockholders. This included the power to sell and dispose of the property of the corporation. It should here be remarked that practically from the very organization of the corporation the promoters and the officers of the corporation en-

tertained the hope that they would be able to sell the railroad to one of the larger railroads of the state, and that from time to time efforts have been made to dispose of the property to the Chicago, Milwaukee & St. Paul Railroad Company, the Chicago & Northwestern Railroad Company, and the Soo line. Defendant *Jones* became president of the company in 1916, and from that time down to the time of the sale of the property to the Soo line was on constant lookout for opportunity to sell the *Wisconsin & Northern Railroad*. His testimony shows that while the railroads of the country were under federal control during the war there was no opportunity to sell the property, as the larger railroads so under federal control were in no position to add to their mileage. However, according to his own testimony, when the railroads were restored to their owners in 1920 the prospects for a sale of the *Wisconsin & Northern* became very much brighter.

In the spring of 1920 the road had been built only as far as Appleton. It was then determined by the directors to extend the road from Appleton to Neenah and Menasha for the purpose of making a connection with the Soo line, which connection it was believed would add greatly to the desirability of the road by one of the principal railroads mentioned. This extension was determined upon in May, 1920, and soon thereafter representatives of the Canadian Pacific Railroad Company made a thorough inspection of the road, its accounts, business, and property. The report made by these representatives to the Canadian Pacific Railroad Company was very exhaustive, went very much into detail, and consists of more than thirty pages of typewritten material. This report was subsequently submitted to President Pennington of the Soo line, which, if not a subsidiary, at least maintains close relations with the Canadian Pacific. In September, 1920, Pennington and other officials of the Soo line made a trip of inspection over the *Wisconsin &*

*Northern Railroad,* accompanied by the defendant *Hartley.* The purpose of this trip was to get all the information it could concerning the railroad.

On October 12, 1920, the defendant *Jones* opened up negotiations with the Chicago & Northwestern Railroad looking towards a sale of the *Wisconsin & Northern* to the Chicago & Northwestern. These negotiations were had principally between *Mr. Jones* and H. R. McCullough, vice-president of the Chicago & Northwestern Railroad Company. Correspondence passed between them from time to time until January 5, 1921. A prospectus of the road was furnished Mr. McCullough. He laid it before President Finley. That *Mr. Jones* must have had some faith in a favorable termination of these negotiations is illustrated by certain correspondence passing between him and Vice-president McCullough. For instance, on November 15, 1920, *Jones* wrote McCullough referring to the fact that he left the prospectus with him, saying: "I expect *Mr. Hartley* here tomorrow, and if there is anything further you would like to discuss with me concerning this matter I shall be glad to meet with you at any time set by you. If, however, the papers do not interest you at this time, kindly return all papers to me here and much oblige." To this McCullough replied under date of November 16th as follows: "The papers which you left with me are still in the hands of President Finley, and I would recommend that they be left in his possession until a little later." Then on November 18th McCullough again writes *Jones* as follows: "Inclosed herewith please find papers sent us with your favor of October 12th, which we understand as per your letter of yesterday you desire to have returned to you. When you can again spare them, if you will return them I will see that they are again placed in the hands of President Finley." On November 26th *Jones* writes McCullough saying that he has given the papers to *Hartley* to hand to

McCullough on his way through Chicago, and adds: "For reasons which you know, I hope Mr. Finley will be able to give us an answer very soon." The papers then remained with President Finley until January 5, 1921, when he returned them to *Jones,* stating: "I am not at present interested in this matter." On December 1st *Jones* wrote to President H. E. Byram of the Chicago, Milwaukee & St. Paul Railroad Company, and also to Mr. A. J. Earling of the same company, proposing a sale of the *Wisconsin & Northern* to that company. The communication to Mr. Byram was answered under date of December 6th in which he stated that it would be impossible to consider the purchase by the Milwaukee & St. Paul of the *Wisconsin & Northern* at that time. A similar answer was written by Mr. Earling under date of December 31, 1920.

*Mr. Bray* went to California early in the year of 1920. He did not return to Oshkosh until about Christmas 1920. During his absence he had lost touch with the affairs of the *Wisconsin & Northern Railroad Company.* He knew nothing of the inspection made by the representatives of the Canadian Pacific, he knew nothing of the investigation of the road made by the officials of the Soo line, he knew nothing of the status of the negotiations with the Chicago & Northwestern Railroad Company. On the 29th day of December the defendant *Hartley* called on *Bray* in his office in the city of Oshkosh. Whether he went there for the purpose of purchasing *Bray's* stock is a matter upon which *Bray* and *Hartley* do not agree. *Bray* claims that the purpose of his visit was to purchase *Bray's* stock for *Jones.* *Hartley* claims that he called on *Bray* for the purpose of notifying him of a meeting of the stockholders of the company to be held at Appleton on January 4th. But however that may be, *Hartley* did communicate to *Bray* that *Jones* would purchase his stock for ten cents on the dollar. The conversation between *Bray* and *Hartley* thereafter is also

in dispute. *Bray* claims he asked *Hartley* every conceivable question for the purpose of ascertaining whether there were any prospects for a sale of the road. *Hartley* denies that *Bray* pressed him with questions in this respect. He testified that "*Mr. Bray* asked quite a few questions in regard to the condition of the affairs of the road. There was just one reference with regard to any negotiations with the Soo line in which he asked if there were any negotiations that would lead to a sale of the property. During the entire conference there was just one question asked about that." However, it is undisputed that neither *Hartley* nor *Jones* at any time told *Bray* about negotiations pending with the Chicago & Northwestern, nor did they at any time tell him anything concerning the inspection of the road made by the representatives of the Canadian Pacific Railroad Company, nor did they at any time tell him of the inspection made by the officers of the Soo line.

After the proposition was submitted to *Bray* by *Hartley* for the purchase of his stock, *Bray* made inquiries concerning the affairs of the road and, especially, with a view of learning whether any sale of the road had been made, or negotiations were pending for its sale. Among others, he talked with Mr. Carl Jackson, then chairman of the railroad commission, and talked with his friend M. J. Wallrich, a stockholder in and attorney for the company. He also talked with two other stockholders at Oshkosh who likewise were considering the proposition made to them by *Hartley* for the purchase of their stock on behalf of *Mr. Jones*. On January 4th *Bray* sent his certificates to *Hartley* together with a letter saying that he had accepted the offer to sell his stock at ten cents on the dollar and requesting an early remittance. On this very day there was a meeting of the trustees at Appleton for the purpose of considering a dissolution of the trust agreement, of which meeting all certificate holders had been notified and requested to attend.

Nothing was accomplished at this meeting and it was adjourned to the 6th day of January at Milwaukee. On the 5th day of January *Hartley* went to Minneapolis and there saw President Pennington of the Soo line. Pennington requested *Hartley* to tell *Jones* that he, Pennington, wanted to see him. At the adjourned meeting held in Milwaukee on the 6th, the trust agreement was dissolved and terminated. On the 7th day of January *Jones* wrote his bank in Chicago arranging for a loan with which to pay for the *Bray* stock and the stock of two other stockholders at Oshkosh. Checks for the amount of *Bray's* stock went forward from the bank to *Hartley* on the 8th or 9th day of January, and on the 10th day of January *Hartley* mailed to *Bray* a remittance covering the amount of his stock. On that very day *Jones* was in Minneapolis and entered into a memorandum agreement with Pennington for the sale of the *Wisconsin & Northern Railroad* to the Soo line. *Jones* first became a stockholder in the *Wisconsin & Northern Railroad* shortly after its organization, owning at first stock of the value of $9,500. By 1909 he had increased his stock holdings in the company to $165,000. In May, 1920, he bought the bonds of the railroad company from Milwaukee banks to the amount of $243,000. In July, 1920, he bought a portion of the holdings of Mrs. Choate in the company, consisting of stock and bonds, for which he paid $54,500, and in December, 1920, he bought the holdings of the Menasha Wooden Ware Company in the company, represented by both stock and bonds, for which he paid $349,500. At the time of the sale he owned a controlling interest in the company and had therein an investment in excess of $800,000.

The narrow question presented upon this appeal is whether it was the duty of *Jones* to inform *Bray* of the negotiations pending with the Chicago & Northwestern Railroad Company, and the interest which had been manifested by the Canadian Pacific and the Soo railroads. It is

the contention of the appellant that the relation existing between *Jones* and *Bray* was that of trustee and *cestui que trust,* and that before purchasing the stock from *Bray* it was his duty to fully advise him of all facts and circumstances within his knowledge, especially those derived by him by virtue of his trusteeship, affecting the value of the stock. Respondents contend that there was no trust relationship existing between *Jones* and *Bray,* that the relation existing between them was that of officer and stockholder of a corporation, that the officer or director of a corporation is not a trustee of the individual stockholders, and that in purchasing the stock of the individual stockholder the officer may deal with the stockholder as though he were a stranger.

Whether an officer of a corporation stands in the relation of a trustee to a stockholder so that in the purchase by the officer of the stock of the stockholder he is under obligation to make full disclosure of matters affecting the value of the stock, is an open question in this state (*McMynn v. Peterson,* 186 Wis. 442, 201 N. W. 272), and we do not deem it necessary to give that question further consideration at this time. We think it plain that the trust agreement set forth in the statement of facts clearly established the conventional relation of trustee and *cestui que trust* between the trustees and the various individual stockholders of the corporation. We do not see how the owner of property could more effectively commit the control and management thereof to a trustee than was accomplished by this trust agreement. By that agreement the stockholders completely surrendered to the trustees every right, privilege, power, and authority which they possessed over the corporation or its property. The legal title to the stock was vested in the trustees upon the books of the corporation. The stock was transferred to the trustees. The fact that by the terms of the trust

agreement the stock when so transferred to the trustees was to be deposited with a depository, which depository was to issue certificates to the respective holders reciting that they were the owners in interest of an aliquot portion of the stock so deposited, amounted to nothing more nor less than mere evidence of their equitable interest in that stock. So far as the management of the affairs of the railroad was concerned, the voice of the stockholders was completely suspended and all power and authority vested in these trustees. To be sure, the trustees collectively constituted the trustee of the individual stockholder, but that relationship existed between each individual trustee and each individual stockholder.

This conclusion leaves little to be said upon the law. That is so well settled that a discussion thereof is mere affectation. There are situations where the trustee may not purchase the property of the *cestui que trust* at all. That is the situation where it is a part of the trustee's duty to make a sale of the trust property, on the principle that the trustee cannot be both the seller and purchaser. That is not the situation in this case. It was no part of the duty of the trustees to make sales of the stock of each individual stockholder. True, they were authorized to make a sale of the stock of all of the stockholders, but that did not authorize a sale of the stock of an individual stockholder. *Jones* was therefore in a position to purchase *Bray's* stock. But because of the confidential and fiduciary relationship existing between him and *Bray,* it was his duty to inform *Bray* of every fact and circumstance within his knowledge affecting the value of the stock. Upon this proposition we are content to confine ourselves to authorities called to our attention in the brief of respondents. Lewin, Trusts (8th Am. ed.) 487; Maitland, Equity, 97; *Vanasse v. Reid,* 111 Wis. 303, 87 N. W. 192; *Ludington v. Patton,* 111 Wis. 208,

86 N. W. 571. The law, as we understand it to be, is stated in the syllabus in the latter case in the following language:

"In all cases where a trustee by contract with his *cestui que trust* obtains the interest of the latter in the subject of the trust, the transaction is presumed to be fraudulent and void, casting upon the trustee the burden of affirmatively showing, clearly, that the two acted at arm's length in the transaction or that it was to the advantage rather than to the disadvantage of the *cestui que trust,* and that he was given all the information possessed by the trustee, and that the latter acted in the utmost good faith."

The trial court found that "neither *Jones* nor *Hartley* withheld from or concealed from plaintiff any material fact touching the affairs of the *Wisconsin & Northern* for the purpose of inducing plaintiff to sell his stock; nor did either, at any time or in any manner, withhold or conceal from plaintiff any material circumstance, information, or fact relating to the *Wisconsin & Northern* for the purpose of leading plaintiff to sell his stock." The court also found that "The trust primarily was to have the stock in proper holding to facilitate a sale of the company, all of which was well understood by the plaintiff." That such was the purpose of the trust is also stoutly maintained in respondents' brief. We therefore have a situation where the stockholders of the company transfer their stock to trustees, recited in the trust agreement that it was made advisable by reason of a plan for financing the railroad, but found by the trial court to have been for the purpose of making a sale of the property of the corporation; a sale of the property of the corporation is desired by a conceded party for the benefit of the stockholders. It would seem to follow that prospects existing for a sale of the property would have a most material bearing upon the value of the stock. The trial court was of the opinion that at the time of the sale of the stock there were no negotiations pending for a sale of the prop-

erty, and, in order to justify that finding, entered into a rather elaborate and technical discussion of what constitutes negotiations. In our opinion it makes no difference whether actual negotiations were in progress or not. Certain facts existed to knowledge of which individual stockholders were entitled in order that they might form their individual opinion concerning the prospects for a sale of the road. For instance, the fact that President Finley of the Chicago & Northwestern road had under consideration the proposal of *Jones* to sell the road to the Chicago & Northwestern Railroad was a circumstance which should have been in possession of *Bray* in order to enable him to exercise his own judgment concerning the prospect of a sale of the property of the corporation to the Chicago & Northwestern Railroad Company. The fact that that company did not subsequently buy the property in no manner affects the proposition. The facts were such as to reasonably lead any one to conclude that the Chicago & Northwestern Railroad Company was giving serious consideration to the proposition, and, if so, how can it be said that the circumstance did not have a material bearing upon the price which a stockholder would be willing to accept for his stock in the company? It seems clear, also, that *Bray* was entitled to know that the Canadian Pacific had made an exhaustive investigation of the property and affairs of the company, and that the investigation of the Canadian Pacific was followed by a trip of inspection over the road by the officers of the Soo line. That certainly indicated an interest on the part of those two railroads in the matter of acquiring the property. To affect the value of the stock it was not necessary that actual negotiations, proposals, and counter-proposals were in progress between the two companies. These are facts to which *Bray* was entitled in order that he might exercise his own judgment concerning the prospects of an eventual sale and to enable him to conclude whether it was to his interest to accept the offer of *Jones* to purchase his

stock for ten cents on the dollar.    These are tangible, definite, and concrete facts which it seems plain had a material bearing upon the value of the stock, when construed in the light of business experience.    Certain it is that much less trivial circumstances have influenced the market price of stocks upon the stock exchanges.    But however that may be, they were facts to which *Bray* was entitled before it can be said that he was dealing on even terms with *Jones.* It seems plain that *Jones* suppressed material information, and that the plaintiff is entitled to judgment in accordance with the demands of his complaint.

*By the Court.*—Judgment reversed, and cause remanded with instructions to enter judgment in accordance with the prayer of the complaint.