Jacob JESSER, Benjamin Rosenberg, Oscar Miller, Joseph Jesser, Meyer Perlstein, Charlotte Brownstein, Helen Asher, Norman Asher, and Harry O. Valleau and Angeline Valleau, d/b/a Harry O. Valleau & Co., Plaintiffs-Appellants,

v.

MAYFAIR HOTEL, Inc., a Corporation, Lennox Hotel Company, a Corporation, Heiss Securities, Inc., a Corporation, Charles Heiss, William S. Bedal, William C. Connett, J. L. Davis, Clarence M. Turley, and C. Gordon Heiss, Defendants-Respondents.

No. 46489.

Supreme Court of Missouri,

Division No. 1.

Sept. 8, 1958.

Motion to Modify Opinion and for Rehearing Denied Oct. 13, 1958.

**466**

Harold C. Ackert, John W. Giesecke and Ackert, Giesecke & Tompkins, St. Louis, for appellants.

Joseph H. Grand, George A. Jensen, Grand, Peper, Martin & Roudebush, St. Louis, for respondents Mayfair Hotel, Inc., Lennox Hotel Co., Heiss Securities, Inc.,

C. Gordon Heiss, Executor of Estate of Charles Heiss, Deceased.

R. H. McRoberts, Bryan, Cave, McPheeters & McRoberts, St. Louis, for respondents William S. Bedal, William C. Connett, J. L. Davis and Clarence M. Turley.

VAN OSDOL, Commissioner.

Plaintiffs, holders of voting trust certificates issued under a voting trust agreement, have appealed from a judgment and decree denying plaintiffs' prayer for injunctive and other relief, and authorizing the sale by defendant voting trustees of part of the capital stock of Mayfair Hotel, Inc.

Defendants herein are Mayfair Hotel, Inc., a corporation; Lennox Hotel Company, a corporation; Heiss Securities, Inc., a corporation; and the voting trustees, who at the time of the institution of this action were Charles Heiss, William S. Bedal, William C. Connett, J. Lionberger Davis and Clarence M. Turley. The death of defendant Charles Heiss during the pendency of the action was suggested, and C. Gordon Heiss, executor under the will of Charles Heiss, was substituted as a party defendant.

The voting trust agreement involved herein was executed January 1, 1943, by and between designated "voting trustees"— Charles Heiss, J. Lionberger Davis, William S. Bedal, Maurice A. Rosenthal, and Clarence M. Turley (it is inferred defendant William C. Connett is successor trustee to Maurice A. Rosenthal)—and "those persons who shall hold the Voting Trust Certificates representing capital stock of Mayfair Hotel, Inc." The agreement was executed pursuant to a plan of reorganization of Mayfair Hotel, Inc. (sometimes hereinafter referred to as "Mayfair"), which plan was duly confirmed by the U. S. District Court for the Eastern Judicial District of Missouri, January 29, 1943. The former stockholders of Mayfair were

not entitled to participate in the plan of reorganization; the lien of a first mortgage was not affected; and second mortgage income bond holders were to receive for each $100 bond a new second mortgage income bond in the amount of $60 and a new voting trust certificate representing one share of common stock.

Plaintiffs hold voting trust certificates representing 244 shares of the 13,988 shares of stock of Mayfair outstanding on August 5, 1955, which stock was deposited with and held by the voting trustees. It was proposed that the stock represented by the voting trust certificates held by plaintiffs and by others, representing a total of 4,320 shares, be sold at a price of $90 per share to defendant Heiss Securities, Inc.

It was and is the primary position of plaintiffs (appellants) that the voting trustees had no power under the voting trust agreement to sell the stock and thereby extinguish plaintiffs' interest in the trust in any manner other than by a sale of all the stock of Mayfair. Secondarily, plaintiffs alternatively had alleged and herein urge the attempted sale of the 4,320 shares of stock was a breach of trust; and further that the sale was in furtherance of a conspiracy on the part of the Heiss interests, holders of voting trust certificates representing a majority of the stock of Mayfair, and the voting trustees to "illegally squeeze out the minority holders of trust certificates, eliminate them as beneficiaries under the Voting Trust and deprive them of their valuable investment at a fraudulently low and inadequate price." Plaintiffs prayed for an order enjoining the sale, for a receivership and corporate liquidation, and other relief. Defendants by their pleadings raised the general issue, and the defendants, particularly the voting trustees, by counterclaims requested the trial court to construe the voting trust agreement and to instruct the voting trustees as to their duties with respect to the sale of the 4,320 shares.

■ The plaintiffs had further alleged and herein contend the price, $90 per share, was substantially less than the value of the stock. There was evidence tending to show that the stock was of value of $150 or more per share. A witness for plaintiffs testified the value per share was $275.02. The amount of $150 per share was purportedly offered for the 4,320 shares by others than defendant Heiss Securities, Inc. The trial court in its decree held the agreement empowered the trustees to consummate a sale of the 4,320 shares, and authorized the sale at $150 per share for the 4,320 shares as offered by others, or, in the event such a sale was not consummated to such other offerers, the trial court directed the sale of the 4,320 shares at $90 per share to Heiss Securities. (Having in mind these issues and contentions we have the opinion this court has appellate jurisdiction of this cause on the ground of the amount in dispute. Const. Art. V, § 3, V.A.M.S.)

Defendant Mayfair Hotel, Inc., is a Missouri corporation. Its principal assets are the 18-story, 325-room Mayfair Hotel, the real estate on which the hotel is situate, and 56,786.6 shares, approximately three-fourths, of the capital stock of Lennox Hotel Company, a Missouri corporation (sometimes hereinafter referred to as "Lennox"). Lennox owns the 23-story, 300-room Lennox Hotel, the land on which the hotel is situate, and 1,068 voting trust certificates of Mayfair. Both of the hotels are operated profitably.

The voting trust certificates of Mayfair as of August 5, 1955, were held as follows —Charles Heiss, now deceased, originally a defendant herein and one of the original voting trustees, 1,954; others of the Heiss family, C. Gordon Heiss and Jean Heiss Donegan, respectively the son and daughter of Charles Heiss, 4,805; the Turner family, associated with Charles Heiss, 2,909; the total holdings of voting trust certificates by these persons being 9,668. Other voting trust certificates were held by Lennox, 1,068, as stated; by voting trustees, an

attorney and certain employees of Mayfair and Lennox, 494; by plaintiffs, 244 trust certificates, as stated; and by others, 2,514. These trust certificates (owned by others than the Heiss and Turner families) aggregated 4,320.

According to the evidence, it had been the hope of Charles Heiss to acquire interests in Mayfair (additionally to those interests owned by him, the members of his family and the Turner family) and thus make the hotel business of Mayfair and Lennox a family enterprise. In the spring or early summer of 1955, C. Gordon Heiss had communicated to the voting trustees the desire of acquiring the 4,320 shares of stock and in July, 1955, the voting trustees decided to offer such shares for sale to the Heisses at the price of $90 per share. "We (the voting trustees) had only considered this sale of the stock that was not represented by Voting Trust Certificates held by Heiss and their interest. * * * The Heiss interests wanted to buy the outstanding minority shares. * * * They already had control."

August 5, 1955, Charles Heiss and his associates caused Heiss Securities to be incorporated for the purpose of buying the 4,320 "minority" shares of Mayfair. Shareholders of Heiss Securities were Charles Heiss and his son and daughter, C. Gordon Heiss and Jean Heiss Donegan. It was contemplated that the Turner family was to participate later. The effect of such a purchase by Heiss Securities of the 4,320 shares would have vested in Charles Heiss and associates or in Heiss Securities the entire ownership of Mayfair. Pursuant to such proposed plan of purchase on the part of the Heiss interests to which the voting trustees had acceded, C. Gordon Heiss, vice-president of Heiss Securities, addressed a letter, dated August 5, 1955, to the voting trustees, Bedal, Connett, Davis and Turley, which was in part as follows,

"On several occasions recently I have discussed with you, four out of the five Voting Trustees acting under a Voting Trust Agreement in respect of the shares of common stock of Mayfair Hotel, Inc., the purchase of the shares of stock represented by the outstanding Voting Trust Certificates. Because of his participation in the purchase offer, Charles Heiss, the only other Voting Trustee, considered that it would not be proper for him to take part in the negotiations.

"As you have already been advised, members of my family, a family closely associated with us, and I hold Voting Trust Certificates representing 9668 shares out of a total of 13988 shares of common stock outstanding. This leaves a balance of outstanding Voting Trust Certificates representing 4320 shares of Mayfair stock held by 235 persons with a median holding of 5 shares each.

"Subject to compliance by you with the provisions of Section 12 of the Voting Trust Agreement dated the 1st day of January, 1943, I offer on behalf of Heiss Securities, Inc., organized by myself and those associated with me, as hereinabove stated, to purchase from you the 4320 shares of stock at a price of $90 per share net to the holders of Voting Trust Certificates, the purchase and sale to be consummated in the Manager's Office of the Mayfair Hotel in St. Louis, Missouri, on September 9th, 1955 * * *."

By letter of the same date, August 5, 1955, the trustees informed the holders of the voting trust certificates representing the 4,320 shares of Mayfair stock of such offer and enclosed a copy thereof. In response to the notice, owners of trust certificates representing 683 shares of the stated 4,320 shares filed objections to the sale. And within the period of time allowed for the filing of objections to the sale the trustees received another offer, by letter dated August 23, 1955, from Messrs. Kamm and Ossey, to purchase all of the capital stock of Mayfair at a price of $150 per share. By letter of May 4, 1956, Kamm and Ossey

made alternative offers for the purchase of all of the capital stock of Mayfair at $200 per share, or for the purchase of the 4,320 shares at $150 per share. By letter of May 18, 1956, Heiss Securities informed the voting trustees that if the sale of only 4,320 shares at $150 per share to Kamm and Ossey could be consummated Heiss Securities would not object, but in the event that such sale was not consummated Heiss Securities intended to hold the trustees to a sale at $90 per share as per the offer of August 5, 1955.

Plaintiffs-appellants assert, and defendants-respondents tacitly concede, that the voting trustees and the other defendants contemplated, and it was understood, that the proceeds of the sale of the 4,320 shares were to be so applied as to close out all beneficial interests in Mayfair except the interests of Heiss and associates, so that thereafter Heiss and associates through Heiss Securities were to become the owners of all beneficial interests in Mayfair (and so it would follow that ultimately, upon termination of the trust, Heiss Securities would become the legal owner of the whole of the corporate stock of Mayfair).

At this point we deem it helpful and expedient to set forth those provisions of the voting trust agreement which, according to the contentions of the parties are material on the primary and, we think, decisive question presented—did the voting trustees have the power to sell part of the capital stock of Mayfair? Our opinion on this decisive question makes it unnecessary to review the evidence on other issues, or to detail the voluminous evidence introduced on the issue of the value of the 4,320 shares of Mayfair.

It was recited in the voting trust agreement that the voting trust certificate holders desired to protect the security of certain second mortgage income bonds which, as stated, were authorized by the plan of reorganization, and that the trust certificate holders deemed it "for the best interests of themselves, and all other persons who may hereafter become entitled to hold Voting Trust Certificates representing capital stock of the Company, to unite the voting power held by such Voting Trust Certificate Holders, and to that end to cause such shares of stock as they may be entitled to, to be issued to the Voting Trustees as hereinafter specified  *  *  *."

The agreement further provided that the voting trust certificates should be substantially in a stated form which included the language that the voting trustees "shall possess and be entitled to exercise all rights and powers of every nature of absolute owners of said stock, including, but not by way of limitation, the right to vote thereon and to execute consents with respect thereof for every purpose, except as provided in said Voting Trust Agreement, it being expressly stipulated that no voting right passes to the above named owner hereof, or his assigns, by or under this Certificate or by or under any agreement expressed or implied."

The agreement provided that all stock held by the voting trustees "hereunder shall be held and disposed of under and pursuant to the terms and conditions hereof"; and that "until the Voting Trustees shall have disposed of shares of stock deposited hereunder pursuant to the provisions of this Agreement, they shall possess the full legal title to all of such stock and shall possess and in their discretion shall be entitled, except as hereinafter provided, to exercise in person or by their nominees, all rights and powers of absolute owners in respect to all stock of said Company held by them, including the right to vote thereon and to take part in and consent to any corporate or stockholders' action of any kind whatsoever and to receive dividends distributed on said stock, and it is expressly understood and agreed that, except as hereinafter provided, the holders of Voting Trust Certificates shall not have any right with respect to any such stock held by the Voting Trustees to vote or take part in or in any way control or limit any corporate or stockholders' action of said Company.  *  *  *"

The power of the voting trustees to sell the stock of Mayfair was included in Section 12 of the agreement and was as follows,

"The Voting Trustees shall have the power to sell the shares of stock deposited with them hereunder. The Voting Trustees shall not, however, sell the stock held by them unless written notice of the terms of such proposed sale shall be given by ordinary mail to all of the registered holders of the Voting Trust Certificates outstanding hereunder at their addresses, as shown on the records of the Agent of the Voting Trustees, mailed not less than thirty days prior to the date of the proposed sale, and the Voting Trustees shall not sell such shares if, within twenty-five days after the mailing of said notice the holders of Voting Trust Certificates representing one-third or more of the shares of the capital stock of said Company, then outstanding, shall in writing inform the Voting Trustees of their objections to such sale." (Our italics.)

By Section 24 of the agreement the voting trustees were further authorized and empowered "to construe this Agreement and their construction made in good faith shall be conclusive and final upon Certificate Holders and upon all of the parties hereto. The Voting Trustees may advise with legal counsel, * * * and any action under this Voting Trust Agreement, taken in good faith by them, in accordance with opinion of such counsel (who may also be the counsel for the Company), * * shall be conclusive upon the parties hereto and the Voting Trustees shall be fully protected in respect thereof."

It is expressly provided (in Section 17) that the voting trust agreement was to terminate January 1, 1958, without notice by or to, or action on the part of the voting trustees or any other parties to the agreement "unless sooner terminated in the manner hereinafter provided." And within thirty days after the termination of the voting trust agreement the voting trustees were required to "deliver or cause to be delivered to the registered holders of Voting Trust Certificates, certificates for the number of shares of Capital Stock represented thereby upon the surrender thereof, properly endorsed. * * *" (Our italics.)

The voting trustees were authorized to own, hold, buy, sell, and deal in the voting trust certificates.

And by Section 33 of the agreement it was provided that the agreement "may be amended, altered or modified by the resolution of all the Voting Trustees. If it is the opinion of the Voting Trustees (which shall be conclusive) that any such amendment, alteration or modification will materially affect the rights of the holders of Voting Trust Certificates, the Voting Trustees shall notify the registered holders of all Voting Trust Certificates * * * of the nature of such amendment, alteration, or modification and such amendment, alteration or modification shall not become effective unless the holders of Voting Trust Certificates representing 51% of the shares of stock of the Company issued and outstanding shall consent thereto in writing. Any amendment, alteration, or modification, which in the opinion of the Voting Trustees (and the opinion of the Voting Trustees shall be conclusive) is not substantial in character, shall become effective upon the adoption of the resolution of the Voting Trustees."

■ A voting trust has been comprehensively defined as a trust created by an agreement between a group of the stockholders of a corporation and the trustee, or by a group of identical agreements between individual stockholders and a common trustee, whereby it is provided that for a term of years, or for a period contingent upon a certain event, or until the agreement is terminated, control over the stock owned by such stockholders, either for certain purposes or for all, shall be lodged in the trustee, either with or with-

out a reservation to the owners or persons designated by them of the power to direct how such control shall be used. Vol. 5, Fletcher, Cyclopedia of the Law of Private Corporations, Perm. Ed., § 2075, pp. 331–337; 13 Am.Jur., Corporations, § 504, pp. 539–541.

The powers and duties of the trustee or trustees are to be determined from the trust agreement as a whole, not reading one provision to nullify another and thus defeat the trust. It is said that the most important part of a voting trust agreement is that which relates to the powers of the trustees. Ostensibly, the agreement vests full legal ownership of the stock in the hands of the trustees, "but it is a rare agreement, at the present time, which leaves the matter here; it will commonly list either the restrictions on the trustee's powers, or the powers themselves, or both." Leavitt, The Voting Trust (1941), p. 50. And we do not doubt that the voting trustees under voting trust agreements, including the instant agreement, are trustees in the true equitable sense. Even in an agreement in which trustees' powers were assumed to have been given without substantial limitation the trustees were obliged to administer the trust as fiduciaries to cestuis que trustent, collectively and individually, nor could the trustees for different classes favor one class at the expense of another. Voting trustees have the duty to exercise the voting powers of shareholders *for the benefit of the trust,* not for the benefit of the majority or minority interests in the trust. See and compare Brown v. Mc-Lanahan, 4 Cir., 148 F.2d 703, 159 A.L.R. 1058; and see the comment on the Brown case, 58 Harvard L.Rev. 739–740. See also Koplar v. Rosset, 355 Mo. 496, 196 S.W.2d 800; Bray v. Jones, 190 Wis. 578, 209 N.W. 675; Restatement, Trusts, § 193; Vol. 2, Scott on Trusts, §§ 193, 193.1, pp. 1457–1461.

Much has been said in the briefs of counsel for the parties with respect to the case of Koplar v. Rosset, supra, 355 Mo. 496, 196 S.W.2d 800. Defendants-respondents have set out the provisions of the voting trust agreement as disclosed by the transcript on appeal of the Koplar case, and have contrasted them with the provisions of the voting trust agreement involved herein. By this contrast of language, defendants-respondents seek to demonstrate that the voting trust agreement in the instant case amounts to more than a mere voting trust, and carries with it the absolute power in the voting trustees to treat with the stock deposited with them and to sell the same as if the trustees were the absolute (legal and equitable) owners thereof. We have examined the Koplar case and respondents' discussion of it in their briefs. We observe that the Koplar case did not involve the power of voting trustees to sell stock represented by voting trust certificates. The Koplar case (action in equity for the removal of trustees) involved, inter alia, the question of whether the voting trustees were under the fiduciary obligation to submit a refinancing plan, and this court held that the refusal of the trustees to submit the plan to the holders of trust certificates was arbitrary and unwarranted. The Koplar case is of value to us here, however, because it supports the principle that a voting trustee is a fiduciary and a voting trust is a trust in the accepted equitable sense.

We have carefully examined the whole of the voting trust agreement and find no express power given to sell part of the stock of Mayfair. We believe the voting trustees were obliged to look to the paragraph of Section 12 which we have italicized supra, and read the same in connection with the whole of the voting trust agreement, for the power to sell the stock of Mayfair. But with respect to the Section it is contended by defendants-respondents that the Section is not an "enabling provision" granting the power to sell stock, but is a "restrictive provision" limiting the power previously given, and the "trustees having been given * * * the power to

sell *all* of the shares constituting the corpus of the trust, subject to the limitations therein expressly provided, then they were, absent specific provisions in the indenture to the contrary, given the power to sell *any part* of such corpus, subject to the same restrictions. The lesser power was of necessity encompassed within the greater." Defendants-respondents cite and quote from Restatement, Trusts, § 190, Comment *h*, p. 507, as follows, "If the trustee is empowered to sell trust property, he may in the exercise of a sound discretion sell it by public auction or by private sale, in parcels or as a whole, at one time or at several times, unless it is otherwise provided by the terms of the trust." Farmers' Exchange Bank v. Thompson, 309 Mo. 669, 274 S.W. 745; Chesley v. Chesley, 54 Mo. 347; Ilari v. Ewing, 314 Ky. 182, 234 S.W.2d 293, 296, are also cited. In the Ilari case it was said that when "it is determined that they (the trustees) had the power to sell the fee simple, then it follows that they were empowered to convey a lesser estate, or interest in the land." The examination of these authorities discloses that the sales by the trustees alluded to or considered were of the corpora of the respective trusts of nature unlike that involved here and under indentures unlike that involved here, and there was no question of any sale on the part of the trustees which would dispose of the beneficial interests of some of the beneficiaries in violation of a trustee's ordinarily recognized fiduciary duties in the administration of a trust to the benefit of all of the beneficiaries, individually and collectively. We think these authorities are of no value to us here.

We suppose the agreement, even though it ostensibly provides for absolute ownership of the trustees of the stock deposited with them, does not leave the depositing shareholder without any right or interest which a court of equity may recognize and enforce or protect. The depositing shareholders, holders of voting trust certificates, generally are spoken of as "equitable owners" whose rights, as we understand it, may be protected in equity in accordance with the principles applicable to trusts, with the purposes of the particular trust in mind, and with a regard for the powers of the trustees as limited, listed or defined by the particular trust indenture. Nelson v. Amling, 319 Ill.App. 571, 49 N.E.2d 868; Application of Bacon, 287 N.Y. 1, 38 N.E.2d 105; Ballantine, Voting Trusts, Their Abuses and Regulation, 21 Tex.L.Rev. 139; Vol. 5, Fletcher, Cyclopedia of the Law of Private Corporations, Perm.Ed., §§ 2091.1 and 2092, pp. 405 et seq. The rights or interests of the equitable owners, holders of voting trust certificates, were the substantial rights to become (as early as January 1, 1958) revested with the legal title to the capital stock at the termination of the voting trust agreement and become re-enfranchised as stockholders with power to vote in the determination of the management of Mayfair's affairs, and to bide their time in exploiting their investments. These rights or interests were, in our opinion, substantial (equitable) property rights which the voting trustees could not lawfully dispose of at any price, with or without the aid of the decree of any court, absent the power so to do as might have been clearly expressed in the voting trust agreement, with the view of fulfillment or furtherance of the purposes of the trust agreement. We think the power of the voting trustees with respect to the sale of the "minority interests" here, at least in the absence of the clear expression of the power, were quite as circumscribed as the power of the majority stockholders of a corporation to expropriate or arbitrarily fix the price and dispose of the interests of the minority. See In re Doe Run Lead Co., 283 Mo. 646, 223 S.W. 600—the majority stockholders under color of dissolution proceedings had no right to fix the price of the stock of dissenting stockholders, and compel them to accept it; the stock of the minority was private property which (with certain exceptions) could not, without the owners' consent, be taken over by any majority,

however great, nor by the payment of any price, however large.

■ We have seen the purposes of the agreement were recited in the instrument as a desire to protect the security of the second mortgage income bonds and to unite the voting power held by the voting trust certificate holders. The paragraph of Section 12, which we have italicized, contemplated the possible sale of the shares of the stock deposited with the trustees (we surmise that this contemplated a possible transfer of the entire ownership of Mayfair) upon written notice to *all* of the registered holders of voting trust certificates "outstanding hereunder," except the trustees could not sell the shares if voting certificate holders representing one-third or more of the shares "then outstanding" informed the trustees of their objections to the sale. But we cannot bring ourselves to the conclusion that the trustees were or could have been empowered to sell a part of the stock of Mayfair at any price however great without a clear and express provision authorizing them so to do. For the trustees, counsel or a court to supply or read into the agreement such an authorization would be to impinge upon the recognized fiduciary obligation of a trustee in the administration of a trust, and permit acts of the voting trustees which ordinarily would constitute a breach of trust.

■ As has been indicated in our quotations of the language and provisions of the voting trust agreement, supra, defendants-respondents rely on the provisions (Section 24) empowering the trustees to construe the agreement and to rely on the opinion of counsel; and (Section 33) to amend, alter or modify the agreement. As to the power of construction and the right to rely on the opinion of counsel—these provisions may not be utilized to strike a provision from the agreement or to insert something new, so that the trustees might enlarge their powers or remove restrictions from them, substantially affecting the rights of the beneficiary certificate holders. United States Leather Co. v. McLeod, 139 N.J. Eq. 311, 51 A.2d 11; Olson v. Rossetter, 399 Ill. 232, 77 N.E.2d 652; Leavitt, The Voting Trust (1941), p. 60; Vol. 5, Fletcher, Cyclopedia of the Law of Private Corporations, § 2091.1, supra. As to the contention that the trustees were given the power to amend, alter or modify the agreement so as to empower them to sell the part of the shares, we think the short sound answer to this contention, in the instant case, is that the trustees did not attempt to so amend, alter or modify the agreement.

■ We are cognizant of the full power of a court of equity to liquidate the assets and business of a corporation where it is made to appear that the acts of directors or those in control of the corporation are illegal, oppressive, or fraudulent. Section 351.485 RSMo 1949, V.A.M.S. We have seen that the voting trustees have attempted a sale of interests of beneficiaries which was unauthorized by the voting agreement, and we have given careful consideration to plaintiffs' claim for the relief of a corporate receivership, dissolution and liquidation. Without detailing the evidence tending to show the following facts, we here say the evidence tends to show and supports the conclusions that the business of Mayfair has been efficiently operated and has been profitable; and that Mayfair is in a reasonably strong cash or financial position. Under the injunctive relief which we shall order protecting these minority interests from the sale of their stock by the voting trustees, we cannot see that these interests are in imminent peril of irreparable injury. While the statute, Section 351.485, supra, provides broader authority than our courts had under their general equity powers, we are constrained to believe the drastic relief of a receivership, or liquidation under the statute is not justified here. This, on the recognition that our policy has been and should be "that courts should proceed with great caution in appointing receivers for corporations, and will do so only to prevent irreparable injury or to prevent justice from being defeated, and only when

**474**

there is no other adequate remedy; that 'this great power * * * ought to be exercised * * * ordinarily only in cases of imminent danger of loss, or of damage or of miscarriage of justice'"; and that neither bad judgment nor past acts or derelictions of directors would alone authorize such relief. Niedringhaus v. William F. Niedringhaus Inv. Co., 329 Mo. 84, 46 S.W. 2d 828, 836; Handlan v. Handlan, 360 Mo. 1150, 232 S.W.2d 944.

The trial court's judgment and decree should be reversed and the cause remanded with directions to enter an order enjoining the sale by the voting trustees of the so-called minority shares of Mayfair, and to enter an order dismissing the defendants' counterclaims at their costs and without allowance of attorneys' fees to defendant voting trustees, and to direct the defendants, voting trustees, to deliver the stock of Mayfair to the registered holders of voting trust certificates all in accordance with the provisions of the voting trust agreement (particularly Section 17 thereof).

It is so ordered.

COIL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court.

All of the Judges concur.

On Motion to Modify and for Rehearing

PER CURIAM.

In examining defendants-respondents' motion to modify opinion and judgment and motion for a rehearing, we have seen that defendant trustees seem perturbed at what they term the inference that they in undertaking to sell part of the stock at Mayfair were acting fraudulently or were fraudulently conspiring to "squeeze out" the minority interests of Mayfair. The opinion is not to be so construed as to imply intentional wrongdoing on the part of the defendant trustees and their counsel. As stated in the principal opinion, the decisive question considered and decided was—"did the voting trustees have the power to sell part of the capital stock of Mayfair?" Our denial of attorneys' fees to the voting trustees upon the facts of this case followed on our findings that the voting trustees were acting beyond their powers. In this connection, the part of the final paragraph directing an order dismissing the defendants' counterclaims at their costs and without allowance of attorneys' fees to defendant voting trustees is modified to read—"and to enter an order dismissing the defendants' counterclaims at their costs and without allowance of attorneys' fees to defendant voting trustees in this case." The motion for a rehearing is overruled.