In the Matter of CHARLES ALLEN, JR., et al., Doing Business under the Name of ALLEN AND COMPANY, et al., Petitioners, against CHASE NATIONAL BANK OF THE CITY OF NEW YORK, as Transfer Agent for Voting Trustees of Common Stock of Wickwire Spencer Steel Company, et al., Respondents.

Supreme Court, Special Term, Bronx County, January 27, 1943.

*Jacob L. Holtzmann* for petitioners.

*Rathbone, Perry, Kelley & Drye* for respondents.

McGEEHAN, J. The motion to confirm the report of the learned Referee is granted, and the sum of $10,000 is hereby allowed to him for his fees.

The motion to terminate the proceeding is granted, with appropriate reservations of the court's jurisdiction to be determined upon the order to be settled hereon.

Furthermore, the petitioners, Allen & Company, apply for an order hereon fixing their costs and expenses in this proceeding to include the fee of their attorney, and directing the payment of same by the respondent Wickwire Spencer Steel Company. This phase of the motion presents facts which differ in some aspects from the usual situation in corporate litigation of this type. Ordinarily a sum of money has been realized from the litigation, and counsel fees are allowed out of that sum. In this instance there is no such fund available, but it is undeniable that the results accomplished have been of great benefit to the corporation and its stockholders.

When this proceeding was instituted, all of the stock of this company stood of record in the names of the respondents, voting trustees. The beneficial owners, over five thousand in number, held mere certificates issued by the voting trustees. As certificate holders they were precluded from any right to vote the stock, and the complete control of the corporation was accordingly in the hands of the voting trustees. The board of directors consisted of the voting trustees and others chosen by them. One of the trustees was named as chairman of the board. The petitioners, Allen & Company, in instituting this proceeding, maintained that the voting trust should have come to an end on March 1, 1942. The voting trust agreement provided for its termination on that date unless the corporation should at the time be indebted to the Reconstruction Finance Corporation (hereinafter called "RFC"), in which event it was to continue until that debt was fully paid.

It appears that when this company emerged in 1937 out of reorganization, under the then section 77B of the Bankruptcy Act (U. S. Code, tit. 11, § 207), it did so under a plan which authorized the borrowing of $2,000,000 from the RFC to provide adequate working capital. It was specifically to meet the requirements imposed as a condition to the making of this loan that all the stock was placed in the voting trust.

By July, 1941, the original loan had been reduced to $594,000, and the current earnings of the company indicated the probability of the complete retirement of the debt before March 1, 1942. On July 25, 1941, a special meeting of stockholders was

held, at which an additional loan of $1,906,000 from the RFC was authorized and the entire loan was to be paid over a period of ten years, subject to certain amortization payments.

As the voting trustees were the legal owners of all of the stock, they were the only ones who had the power to vote at such meeting. This procedure had the obvious effect of prolonging the trust for years beyond March 1, 1942.

The petitioners questioned the motives of the trustees in making this new and larger loan which had the effect of continuing them indefinitely in absolute control of the corporation. Furthermore, they assumed the position that, notwithstanding the motives that prompted the making of the loan, the corporation should avail itself of the right to prepay same. The petitioners advocated doing this in one of two ways, either by procuring a new loan for the amount of the debt or by using the cash then in the treasury. Under the first alternative, if they desired such new loan, Allen & Company offered to procure it at a much lower rate of interest and on the remaining terms at least as favorable as the RFC loan. If the second alternative was to be pursued and they wanted to pay it off without new financing, it was shown by the petitioners that on March 1, 1942, there was $3,200,000 in cash on hand, while the amount due on the debt had been reduced to about $1,500,000. The balance sheet of the corporation as of December 31, 1942, showed current assets of $9,025,648.74 against current liabilities, exclusive of the RFC loan, of only $1,602,360.64. Such payment of the RFC loan would have automatically terminated the trust. The corporation's income statement for the nine months ending September 30, 1941, has since shown a net income after provision for taxes of $2.90 per share for that period of nine months.

The petitioners, as the holders of perhaps the largest block of certificates, sought a meeting of the certificate holders in order, through their concerted action, to induce the trustees to bring about a refinancing that would not only lighten the interest burden on the company, but would result in the termination of the voting trust and the restoration of the full rights of ownership to the beneficial owners of the stock.

Another purpose of the proposed meeting was to give to the certificate holders an opportunity to express an opinion on the advisability of a sale of all of the assets of the corporation. Virtually all certificate holders were originally creditors of the corporation and received their stock in its reorganization. Accordingly there was an understandable desire for the liquidation of these holdings. It appears that in October, 1941, a

responsible prospective purchaser offered to acquire all the assets of the company at a price of $10,698,130.86, which would have netted $16 in cash for each share. This offer was rejected by the board of directors and by the voting trustees without ever having been submitted to the certificate holders for their consideration. Without passing upon the adequacy of this offer, the petitioners contended that the certificate holders, as the beneficial owners of the stock, should have been afforded an opportunity to make known their wishes with regard to the offer to purchase the corporation's assets.

Inasmuch as there were in existence over five thousand individuals who held voting trust certificates, the petitioners were in no position to call a meeting without first procuring a list of all certificate holders. The voting trustees refused to comply with a demand for such list of certificate holders. A prior application to compel an inspection of a list of certificate holders was successfully resisted by the trustees, who contended that the provisions of the voting trust agreement vested in them the sole discretion to permit such an inspection.

On March 17, 1942, chapter 121 of the Laws of 1942 went into effect, which added a new section, 115, to the Stock Corporation Law. Subsequently the petitioners, Allen & Company, made a new demand for a list which was again refused, whereupon this proceeding was duly instituted.

The respondents contended that such prior denial was an adjudication which was a bar to this proceeding. They further contended that section 115 was prospective in its effect and could apply only to voting trust agreements entered into subsequent to the date of its enactment, and that if it be construed as applying to existing agreements, it was violative of section 10 of article I of the Constitution of the United States, and accordingly unconstitutional.

This court overruled the pleas of the respondents and held that it would be in the interests of the certificate holders to hold a meeting for the purpose of expressing their wishes on two matters of utmost importance to them: first, whether the loan of the RFC should be paid off, thus terminating the voting trust agreement, and, second, whether it is desirable at this time to sell the company, and granted the petition, upon certain conditions. (*Matter of Allen* v. *Chase National Bank,* 178 Misc. 536, 538.) On May 6, 1942, a final order was made, directing the voting trustees and their transfer agent to lodge a list of the voting trust certificate holders with Terence J. McManus, Esq., the Referee named in the order, directing that such list be made

available for inspection at such times as the Referee shall fix, and permitting the petitioners to call a meeting of the voting trust certificate holders at such time and place and upon such notice as the Referee shall fix; requiring the notice and any and all other communications to be submitted to the Referee for his approval; directing that any documents which the certificate holders may be requested to sign, including any power or proxy to act for them at any meeting of certificate holders or otherwise, be subject to prior approval of the Referee; empowering the Referee to call to order any meeting of certificate holders, and to preside thereat; and requiring him to report to the court all proceedings had.

The order directed that the expenses of the voting trustees in preparing the list, as well as the fees and expenses of the Referee in an amount hereafter to be allowed, shall be borne and paid by the respondent, Wickwire Spencer Steel Company, permitted the petitioners to submit to the court a statement of their costs and expenses in preparing, printing and mailing such matter as shall have been approved by the Referee, and allowed any party to this proceeding to apply at the foot of the order for such further and other relief as to the court shall seem just and proper.

An appeal to the Appellate Division from the order resulted in an affirmance by that court of this order. (264 App. Div. 764.) Subsequently, that court refused leave to appeal to the Court of Appeals (264 App. Div. 838), and an application was duly made to the Court of Appeals for leave to appeal. The Court of Appeals likewise denied such application. (288 N. Y. 738.)

Almost immediately thereafter, and on June 22, 1942, a meeting of the board of directors of the company was convened in Boston, and at that meeting a resolution was passed directing the officers of the company forthwith to pay to the RFC the amount of its loan. By this action the voting trust came to an end.

Whereupon the respondents, invoking the provision contained in the order of May 6th granting leave to any party to apply at the foot thereof for further relief, moved for an order vacating the final order of May 6th. This court denied the application, holding that the conduct of the respondents failed to establish a legal basis to thwart the relief theretofore granted to the petitioners. Furthermore, the court held that this belated action on the part of the voting trustees ought not to nullify the relief theretofore granted by final order in this proceeding, which had

been sustained by the appellate courts. The court specifically held " that the interests of the certificate holders as well as the corporation itself will best be served by making the list available under the terms and conditions heretofore sustained by the court and embodied in the order." See opinion in *Matter of Allen, Jr.,* decided on July 1, 1942 (unreported).

The list was lodged with the Referee and, after he fixed the time and place for a meeting to be called to order by him, a controversy arose between the petitioners and the respondents as to the nature of the communication to be sent, and particularly as to the type of proxy to be solicited. With the termination of the voting trust, the certificate holders became entitled to exchange their voting trust certificates for stock. That process of exchange normally takes months, and in the meantime some of the security holders occupy the status of voting trust certificate holders while others become stockholders of the corporation. The petitioners sought proxies that would not only give them the right to represent the security holders at a meeting of the voting trust certificate holders, but that would go further and grant to those proxies a right to call a special meeting of stockholders of the corporation to elect a new board of directors that would be pledged to explore fully the possibilities of a sale of the assets of the company.

After lengthy hearings before the Referee, he approved a communication that solicited such proxy and approved a form that the security holders were asked to sign which would grant the powers sought. In order to afford the respondents an opportunity to review the rulings of the Referee, he filed an intermediate report, dated August 25, 1942. The respondents objected to the notice, letter and proposed proxy, and moved to modify the interim report. The court, however, sustained the proposed proxy, and held that the application of sound equitable doctrine required the overruling of the objections made by the respondents, and denied their motion to modify the Referee's interim report.

Because of certain facts called to the court's attention after the hearing, the matter was sent back to the Referee to proceed in accordance with the court's ruling and suggestions contained in the opinion in *Allen* v. *Chase National Bank of City of New York,* decided on September 8, 1942 (unreported). In the course of the hearings before the Referee situations arose which required the sending of certain communications to the security holders, and this was done after the Referee approved same.

The final report of the Referee is now before the court. In substance he states that on the occasion of the last hearing the petitioners' attorney stated that as a result of discussions which extended over a considerable period of time the directors elected one David G. Baird as a member of the board and upon his election passed a resolution appointing Mr. Anton H. Rice, Jr., and Mr. Baird as advisers to the board for the purpose of examining into the possibility of a sale of the assets of the corporation which would be in the interest of the stockholders. The Referee further states that the election of Mr. Baird and his appointment with Mr. Rice to the special committee would accomplish all the purposes for which the petitioners instituted this proceeding — in view of the fact that the voting trust agreement had previously been terminated. Accordingly it was decided to bring this proceeding to an end so as to permit the board to function unhindered by any further litigation. The Referee concludes his report with the statement: '' The restriction upon the security holders' right to vote their stock has been removed. They are now assured that the possibilities of a favorable liquidation of their holdings will be fully inquired into and that they will be afforded an opportunity to determine for themselves what is in their best interest. * * * I respectfully report that the course adopted has the unqualified approval of the referee.''

Having brought about the termination of the voting trust and having achieved the other objectives of the litigation, the petitioners, Allen & Company, now ask the court to fix a reasonable amount to cover the fee of their attorney in this proceeding, as well as reimbursement of the expense incurred by them, and directing the payment of same by Wickwire. The respondents challenge the power of the court to make such allowance. They urge that the petitioners did not seek the recovery of any money or property in the proceeding, and since no fund has been brought into court it is without power to award counsel fees to the petitioners.

It is true that cases coming before this court in which this power has been exercised usually involved situations where a fund was brought into court. The lack of such element, however, does not of itself deprive the court of the right to inquire into the fairness of the application and to grant same if the justice of the situation so demands. The result of the litigation has benefited all of the stockholders equally. The restriction against their right to vote has been removed and the full power to control the affairs of the company is now vested in them. This

right becomes especially valuable because it affords the stockholders a voice on the question of a sale of the assets of the corporation. When the offer of $16 per share was heretofore made, they were foreclosed by the voting trustees from any right to express an opinion on the question of a sale; now, they may determine that question for themselves.

In *Trustees* v. *Greenough* (105 U. S. 527), one individual member of the class bore the whole burden of the litigation and advanced the expenses which were necessary for the purpose of rendering it effective and successful. Answering the contention in that case that the plaintiff should be limited to taxable costs, the court said (p. 532): "It would be very hard on him to turn him away without any allowance except the paltry sum which could be taxed under the fee-bill. It would not only be unjust to him, but it would give to the other parties entitled to participate in the benefits of the fund an unfair advantage. He has worked for them as well as for himself; and if he cannot be reimbursed out of the fund itself, they ought to contribute their due proportion of the expenses which he has fairly incurred. To make them a charge upon the fund is the most equitable way of securing such contribution."

The case of *Sprague* v. *Ticonic Nat. Bank* (307 U. S. 161) specifically recognizes the court's power to make an award in a proper case, even where the applicant did not sue in a representative capacity or where no fund was brought into court. Speaking for a unanimous court, Mr. Justice FRANKFURTER said (p. 166): "That the party in a situation like the present neither purported to sue for a class nor formally established by litigation a fund available to the class, does not seem to be a differentiating factor so far as it affects the source of the recognized power of equity to grant reimbursements of the kind for which the petitioner in this case appealed to the chancellor's discretion. Plainly the foundation for the historic practice of granting reimbursement for the costs of litigation other than the conventional taxable costs is part of the original authority of the chancellor to do equity in a particular situation. Whether one professes to sue representatively or formally makes a fund available for others may, of course, be a relevant circumstance in making the fund liable for his costs in producing it. But * * * the formalities of the litigation — the absence of an avowed class suit or the creation of a fund, as it were, through *stare decisis* rather than through a decree — hardly touch the power of equity in doing justice as between a party and the beneficiaries of his litigation. As in much else

that pertains to equitable jurisdiction, individualization in the exercise of a discretionary power will alone retain equity as a living system and save it from sterility."

The ruling in the case of *Bruce & Co.* v. *Cowdin,* decided on May 28, 1942 (unreported), is not pertinent inasmuch as in that action the corporation sought to be charged with counsel fees was not a party to the action. In this proceeding the corporation concerned was a party to the litigation from the very inception. Furthermore, the final order made by this court, dated May 6, 1942, recognized the corporation's participation and interest as a party in this litigation and made certain definite payments a charge against the corporation and made provision for subsequent applications accordingly.

By breaking the strangle hold on the affairs of the corporation and restoring to the real owners the right to vote on corporate matters, this litigation was of benefit to the corporation itself as well as to its stockholders. The corporation may well be the greater beneficiary of this direct control. By the payment of the loan, more than nine years before its maturity, a large amount in interest has been saved to the corporation — a sum which in the current year alone would aggregate over $30,000. This court has noted that the right to vote ordinarily enhances the value of stock of a corporation from fifty cents to two dollars per share, when conditions are not unusual. In the present instance, this court is satisfied that the actual increase in the value of the stock of approximately five dollars per share is due in some part at least to the restoration of the right to vote to the stockholders. While war conditions have increased the volume of business of the corporation and enhanced its earnings, the improvement of its internal affairs has played an important part in accounting for the more than $2,000,000 in appreciated market value of the stock of this corporation.

In accomplishing these beneficial results both for the corporation and for the stockholders, counsel for the petitioners, Allen & Company, has displayed great resourcefulness and perseverance together with unusual legal skill. Because of his wide experience, he has succeeded in removing every serious obstacle placed in his path by those opposed to terminating the voting trust agreement. Because this court is familiar with this litigation from its inception, it finds that the petitioners secured the relief solely through the efforts of counsel, and not through any generous acts on the part of the respondents. The conduct of respondents, under the circumstances, ought not to be used

to minimize the work or detract from the results obtained through the petitioners' efforts.

The application is granted to the extent of fixing the reasonable value of the services of the attorney for the petitioners, Allen & Company, at an amount to be fixed in the order to be settled hereon, which amount shall have some bearing to the outstanding shares of stock. Inasmuch as it appears that shares with a right to vote are worth from fifty cents to two dollars more than these same shares without this right to vote and this court finds that the petitioners were the proximate cause of obtaining this right to vote for the certificate holders, this fact should at least be given some consideration by the court in the matter of appraising the value of the legal services rendered. Submit proof as to the number of outstanding shares upon the settlement of the order hereon. Disbursements are allowed in the sum of $1,295.59. These amounts are to be paid by the respondent Wickwire Spencer Steel Company.

Settle order.