Martin Foundation, Inc., et al., Plaintiffs, *v.* Phillips-Jones Corporation et al., Defendants.

Supreme Court, Kings County, May 25, 1953.

*Abraham J. Multer* and *Milton A. Seymour* for plaintiffs, for motion.

*Allan D. Emil, Melvin A. Albert* and *Eugene F. Roth* for defendants, opposed.

Meier Steinbrink, Official Referee. In March of 1952, the derivative stockholders' action, out of which this proceeding

grows, was commenced. The action was based on three proposed contracts between the corporate defendant Phillips-Jones Corporation and three of its officers, Seymour J. Phillips, Benjamin Smullyan and Thomas H. Golden. The contracts were annexed to the complaint as exhibits.

These contracts, it appears, were proposed and approved by the board of directors at a meeting held on February 21, 1952, though, among the defendants, there had been some discussion of them prior to that time. They were to become effective after submission and approval at a stockholders' meeting which was the annual meeting to be held on March 27, 1952.

In connection with the action, the plaintiff applied at Special Term for an injunction *pendente lite,* restraining the defendants from considering or giving approval to these contracts until the trial of the action on the merits. The injunction was granted by Mr. Justice Brown.

Defendants and their associates owned a fraction more than 46% of all the outstanding stock of the corporation. Plaintiffs owned about 24% of the stock. Proxies for the meeting had been solicited by the management.

It cannot be seriously denied that the defendants were in a position to control the action at the meeting of stockholders if they were so minded.

On the very day that the proposed contracts were to be submitted for approval to the stockholders, namely, on March 27, 1952, the Special Term granted the temporary injunction order. Naturally, it was obeyed.

Whether it was immediately before the Special Term had granted the temporary injunction or immediately after, by curious coincidence the same board of directors which had given approval to the contracts, passed a resolution authorizing the cancellation of them, and in that resolution there is to be found a phrase referring to them, viz.: " And to cause the same to be withdrawn finally from submission to or any consideration by the stockholders at the annual meeting thereof, as adjourned to May 1, 1952, or any adjournment or postponement thereof; and, Resolved that no further consideration be given to such contracts or any similar contracts, and all consideration thereof shall be permanently discontinued and the matter of action on any such or similar contracts is permanently and finally terminated and closed in all respects."

Thereupon, on March 1, 1952, and before the adjourned stockholders' meeting the three executives entered into agreements with the corporation annulling the proposed contracts.

The corporation then on April 17, 1952, sent a communication to its stockholders which gave details of the proceedings at the annual meeting on March 27, 1952. This letter was the usual informative letter telling of the election of directors and other more or less important matters and ending with this:

" Following the annual meeting of March 27, 1952, the three executives offered to cancel the contracts of February 21, 1952, to avoid further controversy.

" Cancellation agreements to that effect were accordingly executed by the three executives of the corporation. Thus there will be no proceedings at the adjourned May 1, 1952 meeting with respect to the February 21, 1952 contracts, since they no longer exist and steps will be taken to close the meeting."

In spite of this, or still justifiably apprehensive that some subsequent action might be taken, plaintiffs moved for an examination before trial of the defendants. Just prior to this the defendants' answers were amended setting forth as a defense and bar to the action the cancellation of the proposed contracts. Defendants then countered with a motion to dismiss the complaint on the ground that by their cancellation of the contracts, the question had become moot.

The Special Term, in part, granted the plaintiffs' motion for an examination before trial and denied the defendants' motion for judgment on the pleadings, based, as it was, on the argument and contention that the question had become moot.

An appeal was taken and the Appellate Division reversed as to the individual defendants, but not as to the corporate defendant, and in its decision it was stated that the dismissal as to the individual defendants was " without prejudice to any application which plaintiffs may be advised to make for an allowance for counsel fees and expenses incurred."

With this dismissal the plaintiffs' motions for examination before trial, seem to me, likewise become moot. With the decision of the Appellate Division as a guide, plaintiffs, through their attorneys, made their motion at Special Term for such allowances and there, with a brief review of the proceedings thus far taken, Mr. Justice Brenner on April 3, 1953, " Referred to an Official Referee to take proof and report with his recommendations as to the following issues: (1) Whether actual benefit accrued to the corporation as a result of the action and the extent thereof; and if this be resolved in the affirmative, (2) the reasonable value of the legal services rendered and expenses incurred and the amount of counsel fees and expenses to be allowed therefor."

The matter is now here. I have read and considered every one of the voluminous papers in this matter which are in the file of the County Clerk's office (1952—File No. 3668), much of which are contained in the papers on appeal and the order denying *in toto* the motion to dismiss the action. The printed record on appeal is likewise voluminous, covering 309 pages. The quantity and quality of the services performed by plaintiffs' attorneys can only be appreciated when these files in their entirety are examined and read.

I deal first with the question of whether any benefit accrued to the corporation by reason of the derivative stockholders' action. To this the answer must be an emphatic yes, for whatever protestations there may be on behalf of the defendants, there cannot be the slightest doubt but that the contracts were withdrawn from consideration by the stockholders, either because the defendants feared failure if and when an action was brought or possibly feared revolt on the part of the stockholders and the damage which would result to the corporation by reason of or through the continued proceedings in the action.

These proposed contracts were, to say the least, somewhat extravagant. By them the defendants, Phillips, Smullyan and Golden, in concert with their associates, sought not only to feather their own nests and those of some of the members of their families, but likewise sought to make most munificent retirement benefit provisions which, under certain circumstances, either would have inured to their benefit or to the benefit of their wives. With scrupulous care I have examined not only the affidavits submitted for and in opposition to the motion but more particularly the affidavit of William Gellin, supplemented by his oral examination.

The claim is made that the total obligation under the two contracts might reach the staggering sum of 2,753,000 and some odd dollars. This is not to be my guidepost, for a great part of it might well have been earned by the three proposed beneficiaries of the contracts.

However, it cannot be denied that the retirement provisions were benefits to the three intended beneficiaries of the contracts or their wives, in the event of the death or retirement of any one or all of them.

In the moving papers it is asserted with more or less seriousness that as a result of the derivative stockholders' action there was saved to the company a potential obligation under the contracts of something over $2,750,000. It is true that the three contracts would have frozen the salaries and bonuses for a ten-

year period with no option on the part of the directors to reduce compensation or bonuses in the event of a downward trend of business. However, with the cancellation of the contracts, it is not beyond reason to expect that the defendants and their associates, remaining in control, will have due regard to business conditions in voting salaries and benefits in the future. However, it cannot be denied that the elimination of the retirement provision effected a savings of slightly more than $650,000. A revival of that was barred by the terms of the rescission resolution and the letters or agreements signed by the three defendants who, with their wives, would have been beneficiaries of the retirement provisions.

To this extent, I don't understand how it can be questioned that a very substantial benefit flowed to the corporation and all of its stockholders.

I come then to evaluating these services. The elements which must be considered in evaluating the services of lawyers have been rather firmly enunciated by the Court of Appeals in *Randall* v. *Packard* (142 N. Y. 47).

I am aware of the fact that that was a case which dealt, as I recall it, with a contingent retainer. But the fact also remains that whether it be a case of contingent retainer or one based on *quantum meruit,* that one of the main elements is the result attained.

In the *Randall* case the court stated at page 56: " There are several other elements, which must be equally considered in determining the amount of an attorney's compensation * * *. The general rule is that an attorney, in the absence of an agreement, deserves compensation according to the reasonable worth of his services. Of that the jury are the sole judges and, to arrive at their value, they may consider the nature of the services rendered, the standing of the attorney in his profession for learning, and skill and proficiency, the amount involved and the importance to his client of the result.''

It is almost common practice, also, for attorneys in billing their clients to consider the ability of the client to pay. Here one must consider the size of the corporation, its capitalization, the number of outstanding shares and how that capital stock was held, or the number of shareholders and the benefits, if any, flowing to them as the result of the derivative stockholders' action.

The net worth of the corporation at the end of 1951, amounted to $8,455,000. At the end of 1952, by defendants' Exhibit A, offered this morning, that net worth was $8,790,495. Its capi-

talization is 258,036 shares of common stock and 11,112 shares of 5% $100 par value preferred stock. There were approximately 400 stockholders scattered throughout the United States. Forty-six percent of the stock was held by the defendants and their associates, which has already been alluded to, and 24% by the plaintiffs, and the remaining 30% or approximately 77,400 shares, by the 400 miscellaneous stockholders.

Turning again to *Randall* v. *Packard* (*supra*) as a guide, there can be no doubt that plaintiffs' attorneys are of good repute and high standing in their profession. The nature of the services has already been detailed. The amount involved has been set forth. And while defendant corporation was not the client of the plaintiffs' attorneys, nevertheless their services inured to its benefit and were of great importance to the corporation and all of its stockholders.

The ability of the corporation to pay cannot be questioned, and I venture will not be questioned even by defendants' counsel.

Almost every fact thus far stated is culled from either the affidavits submitted in opposition or from the papers on appeal to the Appellate Division, or from the briefs submitted on that appeal by the attorneys for the defendants.

The only other factor which remains is that of the time consumed in the rendition of the services. And that has been set forth in great detail in the recapitulation of the daily register of plaintiffs' attorneys and is covered by Exhibit B annexed to the motion papers.

The services extended from February 27, 1952, to December 18, 1952, and it is disclosed that in the rush and under the pressure of the threatened holding of the stockholders' meeting that the attorneys and their assistants worked through some nights.

Had this been the ordinary case of a retainer on a percentage basis it may be that judge or jury might have fixed a much higher value to the services than I purpose to fix. Some judges or jury might well have fixed the value of the services as high as 20% of the savings. I prefer to be conservative.

In the light of all that has been said, I therefore determine that the services were of value and benefit to the corporation and that approximately 9% plus of the potential savings, or the sum of $60,000, is the fair and reasonable value of the services rendered, together with the actual disbursements of $514.92, and the attorneys for the plaintiffs will have judgment for $60,514.92.