Jacob JESSER Benjamin Rosenberg; Oscar Miller, Joseph Jesser   Meyer Perlstein, Charlotte Brownstein, Helen Asher, Norman Asher, and Harry O. Valleau and Angeline Valleau, doing business as Harry O. Valleau & Co., Plaintiffs-Appellants,

v.

MAYFAIR HOTEL, INC., a corporation, Lennox Hotel Company, a corporation, Heiss Securities, Inc., a corporation, C. Gordon Heiss, C. Gordon Heiss, Executor of the Will of Charles Heiss, Deceased, Defendants-Appellants,

William S. Bedal, William C. Connett, J. L. Davis, and Clarence M. Turley, Respondents.

No. 48586.

Supreme Court of Missouri,

En Banc.

Sept. 10, 1962.

Rehearing Denied Oct. 8, 1962.

Harold C. Ackert, John W. Giesecke, St. Louis, for plaintiffs-appellants.

Joseph H. Grand, Orville Richardson, St. Louis, for defendants, Mayfair Hotel, Inc., et al.

R. H. McRoberts, Bryan, Cave, Mc-Pheeters & McRoberts, St. Louis, for said respondents.

STORCKMAN, Judge.

These cross-appeals are from an order and judgment allowing plaintiffs' attorneys $80,000 as fees for services and $4,327.77 for expenses incurred in the prosecution of an equity action involving the construction of a voting trust agreement. One ground of defendants' appeal is that the allowance of attorneys' fees is excessive by at least $75,000, while the plaintiffs in their appeal assert that the allowance is inadequate in the sum of $60,000. The amounts involved vest jurisdiction in this court. Art. V, § 3, Constitution of Missouri 1945; Section 477.040 RSMo 1959, V.A.M.S.

The history and outcome of the principal litigation is set out in Jesser v. Mayfair Hotel, Inc., Mo., 316 S.W.2d 465, but a brief résumé may be helpful at this point. The voting trust agreement was made as of January 1, 1943, pursuant to a plan of reorganization of Mayfair Hotel, Inc., a corporation, under orders of the U. S. District Court for the Eastern Judicial District of Missouri. Under the reorganization plan, the previous shareholders were wiped out and the income bondholders of the old company, for each $100 bond, received $60 principal amount of new income bonds and a voting trust certificate for one share of the common stock of the new Mayfair Company. The plan and voting trust agreement required the Mayfair Company to issue and deposit with five voting trustees a total of 14,035 shares of its capital stock. The trustees held the legal title and voting trust certificates were issued by the trustees to the persons entitled "evidencing their respective interests in that portion of the capital stock of the Company issued to the Voting Trustees for their benefit." Specific shares were not set aside or identified as being for the use and benefit of particular certificate holders. The trust agreement further provided that the capital stock so deposited by the Mayfair Company should be held for a period of fifteen years and the powers and duties of the trustees with respect thereto were set out in the trust instrument. Mayfair Hotel, Inc., owned and

operated Hotel Mayfair in downtown St. Louis and also owned approximately 75 per cent of the capital stock of Lennox Hotel Company, a corporation, which owned and operated Hotel Lennox, also in downtown St. Louis.

In August 1955, the voting trustees were Charles Heiss, William S. Bedal, William C. Connett, J. L. Davis, and Clarence M. Turley. At that time voting trust certificates had been issued for a total of 13,988 shares of the capital stock held in the voting trust. Charles Heiss and others cooperative with him owned voting trust certificates representing 9,668 shares of the capital stock. Mr. Heiss was one of the voting trustees and had been active in the management of the Mayfair and Lennox hotels for a number of years. The plaintiffs were the owners of voting trust certificates representing 244 shares of the remaining 4,320 shares of stock held in trust. These 4,320 shares or certificates therefore will sometimes be referred to as the minority shares or the minority interest.

On August 5, 1955, C. Gordon Heiss, a son of Charles Heiss, acting on behalf of Heiss Securities, Inc., submitted to the four trustees (excluding Charles Heiss) a written proposal to purchase from the trustees at $90 per share 4,320 shares of Mayfair stock described in the offer as being held by 235 persons in different amounts. Thereupon the four trustees sent out a notice to minority holders of the voting trust certificates describing the offer received and stating that they had agreed to sell their 4,320 shares and would consummate the sale on or before September 9, 1955, unless the holders of voting trust certificates representing not less than 1,440 of these minority shares notified the trustees of their objections prior to August 31, 1955. The trustees recommended acceptance of the offer. Owners of certificates representing 683 shares of stock sent in objections.

On August 25, 1955, the plaintiffs, as beneficial owners of a part of the shares designated, filed a class action in equity for an injunction to prevent the trustees from consummating the proposed sale and for other relief. The defendants, in addition to the five trustees, were Mayfair Hotel, Inc., a corporation, Lennox Hotel Company, a corporation, Heiss Securities, Inc., a corporation, and C. Gordon Heiss, a son of Charles Heiss, and the vice-president of Heiss Securities. While the action was pending, Charles Heiss died and C. Gordon Heiss, executor of the will of Charles Heiss, deceased, was substituted. The trial on the merits in October 1956 was before the court without a jury; the judgment and decree was in favor of the defendants on all of the issues and the injunction sought was denied. The plaintiffs appealed to this court where the judgment was reversed and the cause was remanded with directions to enter a decree enjoining the sale by the voting trustees of the 4,320 shares and dismissing the counterclaim of the defendant trustees at their cost without allowance of attorneys' fees to the defendant voting trustees; and, the voting trust agreement having expired by its terms, the voting trustees were directed to deliver the stock of Mayfair to the registered holders of the voting certificates in accordance with the provisions of the voting trust agreement. Jesser v. Mayfair, Mo., 316 S.W.2d 465, loc. cit. 474.

In due time after remand, the plaintiffs filed an amended petition for attorneys' fees asking an allowance of $140,000 for fees and $4,325.25 for expenses. The court heard evidence and allowed $80,000 for fees and $4,327.77 for expenses. The plaintiffs appealed and so did all of the defendants except the four surviving trustees. The parties have stipulated that in determining the issues presented on these appeals the court may refer to any matter, record, transcript or briefs filed in the supreme court in connection with the previous appeal. To the extent necessary, additional evidence will be referred to in the course of the opinion.

The plaintiffs and their attorneys, Harold C. Ackert and John W. Giesecke, the petitioners in the application for fees and

expenses, have filed joint briefs and will be referred to as the plaintiffs. The defendants, Mayfair Hotel, Inc., Lennox Hotel Company, Heiss Securities, Inc., and C. Gordon Heiss, individually, and as executor of the estate of Charles Heiss, deceased, have filed joint briefs as appellants and will sometimes be referred to collectively as Mayfair. The four surviving trustees are respondents and have filed a joint brief as such.

Appellant Mayfair's first contention is that the trial court had no jurisdiction or power to entertain plaintiffs' petition for an allowance of attorneys' fees and expenses because the supreme court reversed the judgment and remanded the cause with directions which were dispositive of all issues raised by the pleadings thereby depriving the circuit court of further jurisdiction to entertain the plaintiffs' application. Prior to the previous appeal, the trial court by consent of the parties and as a part of its judgment retained jurisdiction to receive and consider an application by any party for allowance of attorneys' fees and expenses incurred in connection with the litigation.

Considerable stress is placed upon the fact that the opinion dismissed the trustees' counterclaim at their costs and denied the claim of the trustees for an allowance of attorneys' fees and expenses. The trustees' counterclaim and cross-bill, in addition to asking for a construction of the trust instrument, prayed " '(c) that the Court allow these defendants their reasonable attorneys' fees, costs and expenses in connection with this counterclaim and cross bill, to be charged against the trust estate and to be reimbursed to them by Mayfair Hotel, Inc.; * * *.' " In granting the injunction and dismissing the counterclaim, the supreme court was confronted with the proper disposition of the trustees' claim for attorneys' fees and expenses which was a part of the counterclaim. The denial of attorneys' fees to the trustees was ancillary to the court's determination that the trustees were at-

tempting to act without lawful authority and that they were not entitled to relief under the counterclaim. The per curiam opinion modifying the judgment and overruling the motion for a rehearing states: "Our denial of attorneys' fees to the voting trustees upon the facts of this case followed on our findings that the voting trustees were acting beyond their powers." 316 S.W.2d 465, 474.

There was no issue before the supreme court as to the fees and expenses of plaintiffs' attorneys and such issue was not adjudicated. The directions in the opinion and mandate did not deprive the circuit court of its jurisdiction and power to hear and determine the application for allowances of fees and expenses to plaintiffs' attorneys. Sprague v. Ticonic Bank, 307 U.S. 161, 168–169, 59 S.Ct. 777, 83 L.Ed. 1184.

One of the contentions urged most strenuously by the Mayfair group is that the plaintiffs and their attorneys are not entitled to an allowance of fees and expenses because plaintiffs' primary purpose and the object of their suit was to terminate the trust by forcing the sale of all of the Mayfair stock or, in the alternative, to destroy Mayfair by forcing a liquidation of its assets and the distribution of its proceeds and further because the overall result of the suit was a net loss and not of substantial benefit to anyone including the trust beneficiaries and Mayfair. This contention requires a further reference to the cause and character of the injunction litigation and to the previous decision of this court.

The transaction which precipitated the filing of the injunction suit was the attempt by the trustees in August 1955 to segregate and earmark 4,320 of the trust shares and to sell them as shares of the minority interest to the holders of the majority of the voting trust certificates at $90 per share pursuant to the offer of Heiss Securities. There is no evidence that the plaintiffs had any intention of filing any action or attacking the administration of the trust prior to this

undertaking. Although the Heiss interests had been negotiating with the trustees since "sometime in the spring" of 1955, the first notice the minority holders had of the purported sale of their interests was upon receipt of the trustees' letter dated August 5, 1955. The letter stated that the trustees had accepted the Heiss offer and unless the holders of voting trust certificates representing "not less than 1440 shares of stock of the Company" notified the trustees of their objections prior to August 31, 1955, the sale would be consummated. As shown by the letter, the purported sale bore the imprimatur of the trustees. Clearly, the litigation was provoked by the trustees' threatened sale of assets in violation of the voting trust agreement. The minority holders had twenty-five days or less to investigate and decide what to do. If anything was to be done other than to acquiesce, the need for action was urgent. It is in this background that we must determine whether the plaintiffs on behalf of themselves and other minority holders acted excessively and with an improper motive in filing their suit and conducting the litigation.

The primary and dominant purpose of the plaintiffs must be determined from the record before us. In this regard, the pleadings in the case, the transcript of the record on the previous appeal, the briefs filed, and the opinion of this court are most revealing and persuasive. The first ground of action alleged in plaintiffs' complaint is that the trustees were without power or authority under the trust agreement or otherwise to sever and sell the 4,320 shares or any part less than all of the shares held in trust. The allegation of this proposition and related matters occupy approximately the first twenty-five pages of the petition as it appears in the transcript on the first appeal. The assertion of grounds for further relief and the prayer make up the last four pages of the petition. Two supplements to the complaint alleged that two additional offers had been received, one for all of the stock, and the other for 4,320 shares, both at prices in excess of the Heiss offer, and

asserted that the conduct of the trustees was not designed to and would not secure for the minority beneficiaries the highest possible price for their shares. These supplements again asserted that the plaintiffs and other beneficiaries had an interest in each and every share in the trust which could not be extinguished without a sale of all the stock and that the trustees had no power to sell only a part. The plaintiffs' first prayer for relief was that the court enjoin the proposed sale of 4,320 shares or set aside the sale if it has been consummated. This as well as other relief sought involved a determination of the authority of the trustees under the trust agreement. The briefs on appeal dealt with the relief sought in approximately the same order and proportion as did the plaintiffs' pleadings. The space and prominence given these issues in the pleadings are not conclusive, but they give some indication of what was uppermost in the plaintiffs' minds.

If the dominant purpose of the plaintiffs' litigation was not squarely before the supreme court on the first appeal, the court's opinion foreshadowed the proper determination of that issue. The opinion at 316 S.W. 2d 467 states: "It was and is the *primary position* of plaintiffs (appellants) that the voting trustees had no power under the voting trust agreement to sell the stock and thereby extinguish plaintiffs' interest in the trust in any manner other than by a sale of all the stock of Mayfair." Emphasis added. The opinion then goes on to say that *secondarily* and *alternatively* the plaintiffs alleged that the attempted sale was a breach of trust and in furtherance of a conspiracy between the majority holders and the trustees to squeeze out and eliminate the minority holders illegally and to deprive them of their valuable investment at a fraudulently low and inadequate price. At page 469 of 316 S.W.2d the court again states that the *primary* and *decisive* question presented is whether the voting trustees have the power and authority to sell a part of the capital stock of Mayfair. At page 471 of 316 S.W.2d the opinion states that: "Vot-

ing trustees have the duty to exercise the voting powers of shareholders *for the benefit of the trust,* not for the benefit of the majority or minority interests in the trust." At page 473 of 316 S.W.2d the court concludes that the trustees were not and could not have been "empowered to sell a part of the stock of Mayfair at any price however great without a clear and express provision authorizing them so to do."

The Mayfair group cite and discuss a number of cases where in general the object of the suit was to have a trust instrument or a part thereof declared invalid or to have it construed in such a way that all or a substantial part of the property would be taken from the trust and vested in the plaintiffs to the exclusion of others, but that is not the situation here. The plaintiffs did not seek to have the voting trust agreement or any part thereof declared invalid. They did not seek to obtain from the trust estate any property other than in accordance with its terms or to obtain for themselves a greater proportionate share than the interest of any other beneficiary. Even the secondary and alternative relief sought by the plaintiffs bore some reasonable relation to the *performance* of the trust in a manner contemplated by its terms. The trust instrument prescribed conditions under which the trustees might sell all of the stock held in trust and there were provisions relating to liquidation. While the term of the trust was fifteen years, there were conditions under which the trust could properly be terminated sooner. The cases cited are not applicable to the facts of this case.

On the evidence before us and in accordance with the previous opinion we hold that the primary and dominant purpose of the plaintiffs and their litigation was to enjoin the unauthorized and unlawful sale of trust assets or to set the sale aside if it had been consummated, and that the relief requested necessitated a construction of the voting trust agreement. The other relief sought but not obtained did not change the primary and dominant character of the action. From this it follows that the construction of the voting trust agreement was not incidental but was of primary importance.

The Mayfair group further asserts that the litigation was primarily a contest between the majority and minority interests. All voting trust certificate holders were of the same class and the conflict of interests did not arise out of the parties status as beneficiaries of the trust. It resulted because the Heiss group claimed the right to obtain legal title to 4,320 shares, as shares beneficially owned by the minority group, by means of an involuntary sale which the plaintiffs contended the trustees had no power or authority to make. So far as this conflict was concerned, it would have been the same if the prospective purchaser had been a stranger to the trust agreement. In Leggett v. Missouri State Life Ins. Co., Mo., 342 S.W.2d 833, 936, this court stated: "In inquiring into the existence of adverseness of interests courts usually, and properly, confine their examinations to the effect of the litigation on the interest common to those who may share in the fund, and *refuse to consider hostility of interests peculiar to the situation of particular individuals."* Emphasis added. To the extent that hostility of interest existed, it was peculiar to the situation or status of the Heiss interests as prospective purchaser of the shares. The trustees claimed to have the right to sell the shares. They were threatening to violate their duty to exercise the voting powers of shareholders for the benefit of the trust and not for the benefit of the majority or minority interests in the trust. Jesser v. Mayfair Hotel, Inc., Mo., 316 S.W.2d 465, 471. This made the injunction suit necessary. The plaintiffs did not have and did not seek any interest except as beneficiaries of the trust estate.

██ Where ambiguity exists in a trust instrument resulting in a legitimate controversy as to the proper distribution of the trust fund or administration of the trust, the party instituting an action to construe

the instrument is entitled to his fees and expenses even though he may benefit personally by the outcome of the litigation. Hereford v. Unknown Heirs, Mo.App., 306 S.W.2d 648, 650; Coates v. Coates, Mo. App., 316 S.W.2d 875, 878 [2]; Trustees v. Greenough, 105 U.S. 527, 26 L.Ed. 1157. See also Leggett v. Missouri State Life Ins. Co., Mo., 342 S.W.2d 833, 936 [61]. The plaintiffs' interests as beneficiaries in the fund did not disqualify them from having their attorneys' fees and expenses allowed.

Mayfair presents in several different ways and places its contention that no allowance of fees and expenses is justified against any of the defendants because the overall result of the litigation was a substantial net loss and of no benefit to anyone concerned. This contention is based largely on the assumption that the sale of the 4,320 shares which was blocked by the injunction would have been a good thing financially for all concerned. The arguments under these points indicate that the Heiss group have never quite accepted the holding of this court that the attempted sale was unauthorized and wrongful.

■ The Heiss interests cannot be permitted to offset or treat as a loss the benefit or gain they anticipated by acquiring the 4,320 shares at $90 per share and by the elimination of the minority shareholders. A claim of loss cannot be based upon a failure to make a profit out of the wrongful and unauthorized act which would not have been permitted to stand in any event. In re Weed's Estate, 163 Pa. 595, 30 A. 272, 273, cited with approval in Leggett v. Missouri State Life Ins. Co., involves preferred creditors who had been required to restore the property they had wrongfully received as security. The preferred creditors then objected to the payment of fees out of the common fund. The Supreme Court of Pennsylvania disposed of the objection in this manner, 30 A. 273: "It is argued, however, that they were losers by the litigation, and therefore they are not within the rule recognized and enforced in Trustees v. Greenough, 105 U.S. 527, 26 L.Ed. 1157, and kindred cases. But in what sense were they losers? In the same that he is a loser who fails to acquire what he has no rights to, or who, having unlawfully obtained possession of the property of another, is compelled to restore it to the owners. The equity which the wrongdoer has in consequence of such a loss is not easily discoverable."

Those minority holders who wanted to sell their voting trust certificates to Heiss Securities were not prevented from doing so. After the suit was filed, Heiss Securities offered to buy voting trust certificates on a voluntary basis at $90 per share and later at $96. This continuing offer was communicated by the trustees to the minority holders although it was not something covered by the trust agreement.

■ As to the Ossey and Kamm offer, Mayfair asserts that if the plaintiffs' contention that the shares of stock in trust were "fungible" was correct then the injunction against the sale of the 4,320 shares caused a loss of $60 per share or a total of $259,200 to all of the beneficiaries including the minority holders. One weakness of this argument is that a sale to Ossey and Kamm of 4,320 from the fungible shares would have primarily benefited the purchaser in that the proportionate dilution of the remaining interests would have reduced the Heiss holdings to less than 50 per cent and there would have been no majority control. The 4,320 shares to be sold represented a little less than 31 per cent of the total. If the shares were fungible, the 9,668 majority shares and the 4,320 minority shares would have been proportionately reduced. Thus approximately 2,986 shares would be taken from the majority group and the same proportion, or 1,334 shares, from the minority interests. This would leave the Heiss group with approximately 6,682 shares, Ossey and Kamm would have had 4,320 shares, and the present minority group about 2,986 shares. Ossey and Kamm

would have obtained at a minority price 4,320 shares which at the termination of the trust would have taken on their proportion of the total value of all the shares since no one group of shareholders would then have a majority interest. The trust would have been deprived of the shares sold and the loss would ultimately have fallen upon the beneficiaries. The contention that all of the beneficiaries suffered a substantial net loss because the sale was enjoined is without merit.

The result of plaintiffs' action was to preserve and keep the trust estate intact. We must assume that the voting trust had a beneficial and salutary purpose at its inception or it would not have been ordered as a part of the plan of reorganizing the hotel company. The voting trust agreement recited that the purpose of the voting trust was "to unite the voting power" and to protect the security of the second mortgage income bonds. If it was initially beneficial, it must have continued to be so in 1955 although only a little more than two years of its existence remained. In view of Heiss's position that the 4,320 shares could be sold by the trustees, it is unlikely that the Heiss group would have had any standing in equity if they undertook to prevent a sale to a stranger who would offer a higher price for the shares. Whether the 4,320 shares were sold to the Heiss interests or to a stranger, it would probably have resulted in the termination of the trust. These 4,320 shares would have been out from under the control of the trustees and free to be voted by the purchaser. The owner would then have been able to elect minority representation on the board of directors. The voting power continued to be united because the injunction suit was filed and the integrity of the trust was preserved.

The injunction issued in the plaintiffs' action saved the trustees as well as the Heiss interests from the doing of a wrongful act and consummating an unlawful sale of trust assets which might easily have cost more to undo than to prevent. In their counterclaim and cross-bill, the trustees belatedly recognized this and sought a determination of their authority. They set out some of the legal entanglements likely to result if the sale was consummated and subsequently set aside and referred to the liabilities that might accrue in the event they refused to consummate the transaction if they had the authortiy to do so. It was beneficial to have the question determined before the sale was consummated even if no value is placed upon the advantage to all concerned in avoiding a breach of trust.

There was evidence tending to show that the liquidation value of the Mayfair stock was from $250 to $275 per share and that C. Gordon Heiss would not sell the Heiss stock for $270 per share. The Mayfair group says that liquidation value is of no consequence in a continuing business and that the fair market value was at most $90 per share because they were minority shares. Of course, if the shares had been acquired by the Heiss interests, they would have become part of the majority shares and would have taken on added value as such. Although liquidation or asset value is not exclusively determinative, it is an important factor for consideration in ascertaining the fair value of shares of capital stock in a close corporation. Phelps v. Watson-Stillman Co., 365 Mo. 1124, 293 S.W.2d 429, 432 [1]. While liquidation value may not tell the whole story of the stock's value, neither does the offer of $90 or $150 per share. On the previous appeal this court held that "the voting trustees could not lawfully dispose" of the rights of the equitable owners at any price, that the certificate holders were entitled to receive their shares of stock and "to bide their time in exploiting their investments." 316 S.W.2d 472. The investments might be exploited to better advantage if perchance all of the shares or the corporate assets were sold to one of the large hotel chains, or if by this means or otherwise the securities were to become listed on a stock exchange where the distinction in value between majority and minority shares does not exist. We need not undertake to put a certain value on the

shares. It is sufficient for the purpose of this case that the evidence tends to show that the corporate shares had a value substantially in excess of either offer which excess would have been lost to the trust estate and ultimately to some or all of the certificate holders if the proposed sale had gone unchallenged. It follows that the construction of the trust agreement and the prevention of the unauthorized sale was a substantial benefit to the Mayfair corporation and to the beneficiaries of the trust.

■ Where one goes into a court of equity and takes the risk of litigation on himself and successfully creates, protects, or preserves a fund or brings about the creation, increase, or protection of a fund in which others are entitled to share, those others will be required to contribute their proportionate part of counsel fees and expenses, and the equitable way to apportion these fees and expenses is to allow them against the fund. Leggett v. Missouri State Life Ins. Co., Mo., 342 S.W.2d 833, 936 [60–61], and cases and authorities therein cited including Koplar v. Rosset, 355 Mo. 496, 196 S.W.2d 800, Trautz v. Lemp, 334 Mo. 1085, 72 S.W.2d 104, and Trustees v. Greenough, 105 U.S. 527, 26 L.Ed. 1157; 14 Am.Jur., Costs § 74, p. 47.

■ A trust beneficiary who prevents a wrongful disposition of trust assets renders a benefit to the trust estate as much as the one who recovers back property wrongfully disposed of. Leggett v. Missouri State Life Ins. Co., Mo., 342 S.W.2d 833, 938; Holthusen v. Edward G. Budd Mfg. Co., D.C., 55 F.Supp. 945; Counsel Fees in Stockholder's Derivative Suits, 39 Col.Law Rev. 784, 799; State ex rel. Weede v. Bechtel, 244 Iowa 785, 56 N.W.2d 173; Allen v. Chase National Bank, Sup., 40 N.Y.S.2d 245; Abrams v. Textile Realty Corp., Sup., 97 N.Y.S.2d 492; Martin Foundation v. Phillips-Jones Corp., 204 Misc. 120, 123 N.Y.S.2d 222.

In accordance with the opinion of the supreme court and the judgment of the circuit court pursuant thereto, the trustees delivered the shares of Mayfair stock to the registered holders of the voting trust certificates. The circuit court specifically retained jurisdiction of the cause for the purpose of determining plaintiffs' claim for attorneys' fees and expenses and for the "determination of the Defendants-Respondents Voting Trustees compliance with the provisions of this decree." The defendant Mayfair now contends that by reason of the distribution of the shares of stock no trust fund remained and the circuit court was thereafter without the power or authority to allow attorneys' fees and expenses against the fund or any former beneficiary. Mayfair cites the statement from Leggett v. Missouri State Life Ins. Co., Mo., 342 S.W.2d 833, 936, stating that, "The equitable way to apportion the expenses of counsel fees is to allow them against the fund." Nothing held in Leggett, in Johnson v. United Rys. Co. of St. Louis, 247 Mo. 326, 152 S.W. 362, 374, or in other cases cited by Mayfair, precludes the allowance of fees and expenses in the circumstances of this case.

Practically all questions now urged by the defendants (including this one) were presented in Leggett v. Missouri State Life and determined adversely to the defendants' present contention. In Leggett the assets of the insolvent company were sold to General American Life Insurance Company under a purchase agreement and the litigation arose on exceptions to the final accounting of General American. The result was the reallocation of the charges and credits in the accounts which General American was required to pay. In Koplar v. Rosset, the counsel fees and expenses were ultimately allowed against Marmaduke Apartments, Inc., the corporation whose stock was held in the voting trust, and this court stated with respect to the retention of jurisdiction by the trial court to make such allowances: " * * * we think the corporation as well as other trust certificate holders benefited by this action, therefore the trial court's action was proper." 196 S.W.2d 800, 809[11]. See also

Koplar v. Rosset, 360 Mo. 1201, 233 S.W. 2d 1, 3. Cases from other states in which attorney fees have been awarded where there was presently no fund in court are: State ex rel. Weede v. Bechtel, 244 Iowa, 785, 56 N.W.2d 173, cancellation of an improper stock issue; Allen v. Chase National Bank, Sup., 40 N.Y.S.2d 245, termination of voting trust and restoration of voting power to shareholders; Abrams v. Textile Realty Corp., Sup., 97 N.Y.S.2d 492, action to enjoin ultra vires refinancing plan; Martin Foundation v. Phillips-Jones Corp., 204 Misc. 120, 123 N.Y.S.2d 222, action to enjoin payment of excessive compensation. The leading case of Trustees v. Greenough, 105 U.S. 527, 533, 26 L.Ed. 1157, recognizes that reimbursement may be equitably made "either out of the fund itself, or by proportional contribution from those who accept the benefit of his efforts."

The distribution of the shares of stock did not extinguish the jurisdiction of a court of equity to allow attorneys' fees and expenses incurred in the construction of the trust instrument and the preservation of trust property. This is especially true in view of the provisions of the voting trust agreement for the payment of the charges and expenses of the trust.

The trust agreement provides in section 25 that the voting trustees are authorized to incur and pay reasonable expenses and charges including any charges incurred in connection with the voting trust agreement. The expenses and charges incurred by the trustees "if not paid by the Company" could be deducted from the dividends or other income collected by the trustees on the stock deposited or from the distributive proceeds in the event of dissolution or liquidation of the company. It is further provided that the holders of voting trust certificates shall be liable for their pro-rata shares of any and all payments due the voting trustees. This section further provides that Mayfair Hotel, Inc., agrees "to reimburse them [the trustees] for any and all expenses or charges incurred by

them hereunder and to indemnify them against any and all proper and necessary liabilities incurred by them directly or indirectly as Voting Trustees hereunder."

The voting trust was designed and imposed by the federal court for the benefit of the reorganized Mayfair Company and through it for the benefit of the income bondholders, the voting trust certificate holders, and ultimately the shareholders of the company. The provisions of the voting trust agreement disclose an intent that the charges and expenses of operating the trust be paid by the Mayfair Company as a necessary expense for the benefit it received for the operation of its business under the favorable conditions of the voting trust. Plaintiffs' petition specifically prays for judgment against Mayfair Company. It was within the trial court's equitable jurisdiction and sound discretion to impose the obligation to pay these expenses and charges of the trust upon the Mayfair Corporation. This is in keeping with the holding in Koplar v. Rosset, 355 Mo. 496, 196 S.W.2d 800, 809[11], and other cases above cited.

The judgment originally provided that the allowance for attorneys' fees and expenses should be "taxed as costs against all defendants in the proceeding herein." On motion of the trustees, the judgment was amended so as to tax the allowance as costs against all defendants "other than defendants William S. Bedal, William C. Connett, J. L. Davis and Clarence M. Turley." The plaintiffs claim the trial court erred in amending the judgment so as to eliminate the trustees. The plaintiffs now concede that they are proceeding against the trustees only in their representative capacity as trustees of the voting trust. The trustees assert that the plaintiffs' amended petition for attorneys' fees and expenses does not state a claim or seek a judgment against them and that they are not liable on any theory. The application leaves no doubt that the plaintiffs were seeking to impose a liability on the trust es-

tate for their attorneys' fees and expenses. Jurisdiction of the circuit court was reserved for this purpose. The prayer of the application seeks the allowance "as an expense of the trust". The four surviving trustees were trustees of an express trust and as such were proper parties defendants representing all of the beneficiaries of the trust estate. S.Ct. Rule 52.01, V.A.M.R.

█ The petition was sufficient to support a judgment for attorneys' fees and expenses against the trustees in their representative capacity as an expense of the voting trust. The claim of liability of the trustees in their representative capacity is consistent with plaintiffs' pleadings and trial theory and is not repugnant to the prayer for relief. Kemp v. Woods, 363 Mo. 427, 251 S.W.2d 684, 687–688[3–5]; LaPresto v. LaPresto, Mo., 308 S.W.2d 724, 726[2]; Anison v. Rice, Mo., 282 S.W.2d 497, 502[4–6]. The judgment should have run against the four surviving trustees not in their individual or personal capacity but as trustees representing the voting trust estate since the allowance of attorneys' fees and expenses was proper as a charge or expense of the trust estate. Scott on Trusts, 2d Ed., Vol. III, § 271A; Baird v. National Health Foundation, 235 Mo.App. 594, 144 S.W.2d 850, 856[15]; 49 C.J.S. Judgments § 51a(2), p. 121. To this extent the modification of the judgment was erroneous.

The Mayfair group further asserts that the trial court had no jurisdiction to tax plaintiffs' attorneys' fees and expenses *as costs* or to enter judgment for such fees and expenses against any defendant. In Sprague v. Ticonic Bank, 307 U.S. 161, 165, 59 S.Ct. 777, 779, 83 L.Ed. 1184, the court states that sources bearing on the history and development of equity jurisdiction "uniformly support the power not only to give a fixed allowance for the various steps in a suit, what are known as costs 'between party and party,' but also as much of the entire expenses of the litigation of one of the parties as fair justice to the other party will permit, technically known as costs 'as between solicitor and client.'" And further, page 166, 59 S.Ct. page 780: "Plainly the foundation for the historic practice of granting reimbursement for the costs of litigation other than the conventional taxable costs is part of the original authority of the chancellor to do equity in a particular situation." It is of no consequence by what name the allowances for attorney fees and expenses are designated if the circumstances that justify their assessment are present.

█ By reason of their interests in the subject matter, all of the defendants were proper parties to the main action although the defendant trustees by reason of holding the legal title were the only ones who could transfer and convey the shares if authority to do so existed. Since they did not prevail, the conventional costs, or the costs between party and party, in the main proceeding were properly taxed against all of the defendants. Expenses of litigation, or costs as between attorney and client, however, are in a different category. We have held that where a person at his own risk protects or preserves a fund, the others entitled to share in that fund will be required to contribute proportionately to the expenses of litigation and that the equitable way to apportion the expenses is to pay them out of the fund or from other sources in which all are proportionately interested. The surviving trustees represented the trust estate and all of its beneficiaries. Mayfair Hotel, Inc., benefited by the action and under the voting trust agreement was the source of funds to pay the charges and expenses of the trust estate. In these circumstances we find no authority or justification for imposing the costs of the litigation upon the defendants other than the trust estate and the Mayfair Company. Accordingly, it was error to render judgment for plaintiffs' litigation expenses against the defendants Lennox Hotel Company, Heiss Securities, Inc., C. Gordon Heiss, individually and as executor of the will of Charles

Heiss, deceased. This is in keeping with the theory of the trustees themselves; in the prayer of their pleadings in the main action, they ask that their reasonable attorneys' fees, costs and expenses in connection with their counterclaim and cross-bill "be charged against the trust estate and * * * be reimbursed to them by Mayfair Hotel, Inc."

The final question presented by the two appeals involves the amount of the award of attorneys' fees. The plaintiffs and their attorneys claim that "it is demonstrably inadequate". The defendants, on the other hand, claim that the allowance is excessive.

The services were rendered principally by Mr. Ackert and Mr. Giesecke in St. Louis and four attorneys in Chicago where some of the plaintiffs resided. It is unnecessary to describe the legal services in detail. The nature of the services performed are reflected in the records, briefs, and the decision in the first appeal, Jesser v. Mayfair Hotel, Inc., Mo., 316 S.W.2d 465, supplemented by the testimony of the attorneys. They testified that more than thirty-five hundred hours were expended by the six attorneys who participated on behalf of the plaintiffs over a period of almost three years; that a reasonable hourly charge would be at least $40; and that an allowance of $140,000 for attorneys' fees would be justified. Four distinguished members of the Missouri Bar practicing in St. Louis who had acquainted themselves with the services rendered and the results of the litigation testified as to the value of the services. They were James M. Douglas, a former member of this court, Jacob M. Lashly, Roberts P. Elam, and John A. Arnold. They all testified that a charge of at least $40 per hour was justified in the circumstances of this case and, based on the time consumed, the nature of the services, and the result accomplished, a fee of at least $140,000 was reasonable.

Mayfair contends that a large amount of time was spent unnecessarily in trying to obtain without success secondary or alternative relief. The possibility of unnecessary work as well as overlapping of efforts will be considered as we are sure it was by the trial court. The Mayfair group also asserts that a reasonable time allowance to investigate, prepare and try the case, and handle the appeal on the question of the trustees' authority to sell less than all the stock, would be about one hundred hours, and that a reasonable charge for those services would not exceed $5,000. We cannot agree that plaintiffs' attorneys, or any attorneys, possess the acumen and foresight under the circumstances in this case to select the precise issue upon which they will ultimately prevail and to reject all others, or to adduce the exact amount of evidence needed and no more. The necessity and reasonableness of the time and effort expended must be determined in the light of the circumstances then existing and not in retrospect.

Supreme Court Rule 4.12, V.A.M.R., provides helpful guides in ascertaining the value of legal services. We have considered and applied these standards. The question involved was undoubtedly a novel and difficult one. The pleadings, transcript, and briefs on appeal in the main case bespeak the industrious application of a high degree of legal learning and skill. The opposing lawyers were equally capable and resourceful. We have considered the subject matter and the amount reasonably involved in the controversy and the benefits resulting from the services rendered. Arriving at a proper charge is often difficult for the lawyer; it is hardly less so for the court.

In cases tried upon the facts without a jury, the appellate court reviews both the law and evidence as in suits of an equitable nature, giving due regard to the opportunity of the trial court to judge the credibility of the witnesses, and the judgment shall not be set aside unless it is clearly erroneous. S.Ct. Rule 73.01(d), V.A.M.R.; Section 510.310, subd. 4, RSMo

1959, V.A.M.S.; Leggett v. Missouri State Life Ins. Co., Mo., 342 S.W.2d 833, 850[2]. From our independent evaluation of the evidence, we have concluded that the sum of $80,000 is a reasonable allowance for the legal services benefiting the trust estate and chargeable against it. The plaintiffs' contention that the sum is inadequate as well as the defendants' claim that it is excessive are both denied.

■ The Mayfair group further contends that the expense allowance of $4,-327.77 should be disapproved in its entirety because there was no evidence of the amount of expense properly allocable to that portion of the plaintiffs' effort in which they succeeded. The plaintiffs' evidence tended to prove that the expenses in the sum of $4,327.77 were reasonable and necessary in connection with the litigation. The defendants did not by evidence or cross-examination establish otherwise. We can do no better. The request that we disapprove the allowance in its entirety is denied.

The judgment of the trial court is affirmed in part and reversed in part in accordance with the foregoing opinion. The finding and allowance in favor of the plaintiffs and their attorneys of $80,000 for legal services and the sum of $4,327.77 for expenses as costs of the injunction litigation and as an expense of the trust estate are affirmed.

■ Where a judgment creditor appeals on the grounds of inadequacy from a recovery in his favor, and the judgment is affirmed, he is not entitled to interest pending the appeal. Komosa v. Monsanto Chemical Co., Mo., 317 S.W.2d 396, 398[2]. We deem the application of this rule to be appropriate in the circumstances of this case in spite of the fact that the plaintiffs were successful on one facet of their appeal, and the further fact that the Mayfair Company and other defendants also appealed. Accordingly interest on the amount for which the judgment is affirmed will not be allowed during the pendency of this appeal and will not commence to run until the date this opinion and mandate is filed in the circuit court.

It is further ordered and decreed: that said fees and expenses aggregating $84,-327.77 be allowed and assessed against the defendants William S. Bedal, William C. Connett, J. L. Davis, and Clarence M. Turley, in their representative capacities as trustees under the voting trust agreement (and not personally or individually) as a charge and expense of carrying out the voting trust agreement; that the plaintiffs and their attorneys, Harold C. Ackert and John W. Giesecke, have and recover of the defendant Mayfair Hotel, Inc., the said sum of $84,327.77 as costs of the injunction litigation and as a charge and expense of the voting trust agreement; that the said sum of $84,327.77 so allowed, assessed, and adjudged shall be payable directly and only to Harold C. Ackert and John W. Giesecke and not to the plaintiffs; that if the amount due on the above judgment is not paid by the defendant Mayfair Hotel, Inc., the judgment creditors shall not be deprived of any other remedy they may have under the voting trust agreement or otherwise for the collection of said judgment; that payment to Harold C. Ackert and John W. Giesecke of the sum of $84,327.77 allowed, assessed, and adjudged as costs of the injunction litigation and as a charge and expense of the voting trust agreement shall constitute complete satisfaction and payment in full of all sums allowed and decreed herein; that the claim of the plaintiffs and their attorneys for allowance of said attorneys' fees and expenses against the defendants Lennox Hotel Company, Heiss Securities, Inc., C. Gordon Heiss, individually and as executor of the will of Charles Heiss, deceased, is denied; and that the conventional costs in this case in the trial court and on appeal are ordered taxed against the defendant Mayfair Hotel, Inc.

The cause is remanded with directions to enter judgment accordingly.

All concur.